KERR–McGEE CORPORATION,
Appellant (Petitioner),

v.

WYOMING OIL AND GAS CONSERVATION COMMISSION; and Wyoming Department of Revenue and Taxation, Appellees (Respondents).

No. 94–292.

Supreme Court of Wyoming.

Sept. 27, 1995.

Craig Newman, Casper, for Kerr–McGee Corporation.

Joseph B. Meyer, Attorney General; Roberta Rinegar, Assistant Attorney General, Casper, for Wyoming Oil and Gas Conservation Commission.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

The primary issue we address in this case is the limits of the authority of an administrative agency, a creature of the legislature. The question presented is whether the Wyoming Oil and Gas Conservation Commission (Commission) has the authority to deny a statutory two percent excise tax exemption in certifying a tertiary recovery project. The Commission, using ambiguous language, apparently certified the project, which was to be conducted in a production unit that previously had been certified for a tertiary recovery project and had received the benefit of the exemption, but the Commission purported to deny the tax exemption. The new application for certification was based upon the utilization of a different recovery process. In its Report of the Commission, the Commission, responding to an objection lodged by the Department of Revenue (Department), concluded the newly certified project should not receive the benefit of the exemption. We hold that, under the statute assigning administrative authority to the Commission, there is no power afforded it to adjudicate revenue or taxation issues. We perceive the Commission endeavored to combine oil and water. We reverse and remand the matter to the Commission because its order was without statutory authority and contrary to law.

In Kerr–McGee Corporation's Brief of Appellant, the issue is stated as:

Whether the decision below is contrary to law, lacking in statutory right and unsupported by substantial evidence in concluding that Appellant's new tertiary production project is not entitled to the 2% severance tax exemption afforded by Wyo. Stat. § 39–6–302(j).

The Appellee, Wyoming Oil and Gas Conservation Commission, states the issue to be:

Whether the Wyoming Oil and Gas Conservation Commission's denial of Kerr–McGee Corporation's application for an order certifying the proposed tertiary recovery project for the North Buck Draw Dakota Unit is in conformity with law and supported by substantial evidence.

The Commission first certified a high-pressure miscible gas injection project in the North Buck Draw Dakota Unit (Unit) of Campbell County, Wyoming, as a qualified tertiary enhanced recovery project on March 18, 1988. That certification was ordered in response to an application by Kerr–McGee, and made the project eligible for a two percent excise tax exemption for five years on the project's production, pursuant to statute and the Department's rules and regulations.[1] The first tertiary production from the Unit commenced in 1988, and the five years for the tax exemption was terminated by the Department on December 31, 1993.

On June 22, 1994, Kerr–McGee filed a new application for the Unit seeking certification from the Commission of a different tertiary enhanced recovery technique. The proposed technique involves the alternate injection of

---

1. Wyo.Stat. § 39–6–302(j) (1994) provides:

Tertiary production resulting from projects certified by the Wyoming oil and gas conservation commission after July 1, 1985 and before December 31, 1994, is exempt from two percent (2%) of the excise tax imposed by W.S. 39–6–302(b) for a period of five (5) years from date of first tertiary production.

water and gas, which is known as a WAG process. The Commission found this recovery technique would extend the economic life of the Unit for approximately two to four years and would result in the recovery of an additional 1.8 million barrels of oil. Kerr–McGee estimated the State of Wyoming would receive an additional $4 million in revenue from the additional oil recovery.

The Department filed an objection to Kerr–McGee's application for certification of the second project for the Unit. The Department contended the proposed second project for the Unit did not qualify for the five-year tax exemption because using the WAG process constituted only a change in recovery technique, rather than the initiation of a new project, under the definition found in Wyo.Stat. § 39–6–301(a)(vi).[2] In the Department of Revenue Objection to Application for New Tertiary Recovery Project, the Commission was requested to "deny the Applicant's [Kerr–McGee's] request for an additional five (5) year severance tax exemption certification of its North Buck Draw Unit." The hearing before the Commission was held on July 14, 1994.

The record discloses all four of the Commissioners present at the hearing voted in favor of approving the second proposed project for the Unit as "meeting all the qualifications of a tertiary project based on the incremental oil and the initiation of new procedures." It appears that this motion was made subject to approval from the Attorney General. The transcript demonstrates:

COMMISSIONER DOW: * * * I guess the real question goes right to intent. Did the legislature intend that you would be able to qualify for multiple five-year exemptions?

MR. BASKO: Well, whether they intended it or not, **I think that every time that you implement a project that will squeeze additional oil out of the reservoir above the baseline in incremental oil, you ought to be entitled to a 2 per-**

cent, whether you do it twice or three times or four times.

COMMISSIONER DOW: Well, I would agree, but I don't know that—I guess that's what the internal—the Attorney General will have to figure out, whether the state legislature had that in mind or not. (Emphasis added.)

Following this dialogue, a motion to approve the second tertiary recovery project for the Unit was made:

COMMISSIONER CROUCH: Well, I move that we consider this a tertiary two project and grant the severance tax break according to the rules that we have governing the start-up, however you want to phrase that.

ACTING CHAIRMAN SCHRINAR: Are you saying, Mr. Crouch, to approve it subject to a final ruling from the Attorney General—

COMMISSIONER CROUCH: Right, as to—

ACTING CHAIRMAN SCHRINAR: — whether or not it can legally be granted?

COMMISSIONER CROUCH: From our standpoint, I would move that we consider this to be qualified for the tax break. Whether they will get it or not, that's—

ACTING CHAIRMAN SCHRINAR: Okay. As part of the motion, could we simply indicate that we would expect Ms. Rinegar to work with Mr. Basom or whoever from the Department of Revenue in seeking an Attorney General's opinion?

COMMISSIONER CROUCH: Right.

On July 29, 1994, the Attorney General very appropriately declined to issue an opinion. The Attorney General explained to the Commission that advice from his office to administrative agencies could be sought only prior to the holding of a hearing in a contested case. He pointed out Wyoming law "clearly and unambiguously places the duty of certification squarely and solely upon the Commission." This advice from the Attor-

---

**2.** Wyo.Stat. § 39–6–301(a)(vi) (1994) furnishes this definition:

"Tertiary production" means the crude oil recovered from a petroleum reservoir by means of a tertiary enhanced recovery project to which

one (1) or more tertiary enhanced recovery techniques meeting the certification requirements of the Wyoming oil and gas conservation commission or the United States government are being applied; * * *.

ney General was sound and avoided the potential of a violation of the doctrine of separation of powers. Although the Commissioners present unanimously voted to certify Kerr–McGee's WAG project for the Unit at the hearing on July 14, the Commission issued a contrary order on August 25, 1994. In the Report of the Commission, the severance tax exemption provided by WYO.STAT. § 39–6–302(j) was denied for Kerr–McGee's proposed WAG recovery project.

In the Findings of Fact in the Report of the Commission filed on August 25, 1994, the Commission stated:

> 9. The injection of six to seven thousand barrels of water a day would increase the sweep efficiency by forcing the gas to contact previously noncontacted oil in the tighter areas of the reservoir (as shown by Kerr–McGee's Exhibit No. 2) thereby **substantially increasing the volume of oil to be recovered from the unit. It is estimated that the proposed project would result in the recovery of an additional 1.8 million barrels of incremental oil thereby extending the economic life of the unit by an additional two to four years.** (Emphasis added.)

Then, after quoting WYO.STAT. § 39–6–302(j) (1994), which authorizes the two percent tax exemption for tertiary projects certified by the Commission, the Commission stated in its Conclusions of Law:

> 5. The five year limitation on the exemption does not attach to any one particular project: it attaches to the tertiary production from a petroleum reservoir recovery area and allows the exemption for five years from the date of the first crude oil recovered from that reservoir or recovery area by means of a tertiary enhanced recovery project or projects to which one or more recovery techniques, which meet the Commission's certification requirements as stated in Rule 341, are being applied.

> 6. The recovery of crude oil from the North Buck Draw Dakota Unit by means of a tertiary enhanced recovery project certified by this Commission was first obtained in 1988: more than five years has elapsed since the first tertiary production from the reservoir.

> 7. **Any tertiary production from Kerr–McGee's proposed WAG project does not qualify for the two percent (2%) severance tax exemption provided by W.S. § 39–6–302(j).** (Emphasis added.)

The Report of Commission then ordered, somewhat ambiguously:

> [T]hat Kerr–McGee's application for an order certifying a new tertiary recovery project for the North Buck Draw Dakota Unit **as being entitled to the severance tax exemption** provided by W.S. § 39–6–302(j) be, and the same hereby is, denied. (Emphasis added.)

Kerr–McGee filed a Petition for Review of the Commission's "Decision" to the district court and followed that by a motion to certify the case to the Wyoming Supreme Court. The Commission stipulated to the granting of that motion, and the district court certified the case for our consideration by an order entered October 20, 1994.

We begin with a discussion of the theory of providing for administrative agencies in government. The basic justification for creating administrative agencies is to accomplish details of governmental activities that the legislature is not able to accomplish. The reason for the development of administrative agencies at the federal level has been articulated as:

> Experience early proved the inability of Congress to prescribe detailed schedules of rates for railroads, or to keep abreast of changing needs concerning the levels of import duties. **Gradually our legislative bodies developed the system of legislating only the main outlines of programs requiring constant attention, and leaving to administrative agencies the tasks of working out subsidiary policies.** This system facilitated not merely the promulgation of law through rules and regulations but the correlation of rulemaking with such other necessary activities as adjudication, investigating, prosecuting, and supervising.

KENNETH CULP DAVIS, ADMINISTRATIVE LAW TEXT § 1.05 (3d ed. 1972). Another author

has distinguished the role of the agency from that of the legislature in this way:

> The legislature is established by the Constitution and endowed by it with the power to vote laws as the elected representatives of the people. The administrative agency is a creature of the legislature; it bears the same relationship to its enabling statute that a corporation does to its charter. The agency may possess the power to lay down prescriptions that have the force of law, but it does so solely because of delegation from the legislature.

BERNARD SCHWARTZ, ADMINISTRATIVE LAW § 1.6 (2d ed: 1984).

It is important to note that the authority of any particular agency "to lay down prescriptions that have the force of law" is limited:

> Coupled with the power to delegate are limitations thereon, e.g., legislative, i.e., only certain powers are granted and the agency cannot go outside these and act ultra vires, judicial, i.e., in the actual delegation (the basic statute) there exists a method of control over the delegation itself. This latter control is enforced through the constitutional-judicial requirement that power so delegated be confined by the erection of walls, these being termed standards. Every delegation must therefore contain appropriate standards, appropriateness (reasonableness) being a judicial question.

MORRIS D. FORKOSCH, A TREATISE ON ADMINISTRATIVE LAW § 68 (1956) (footnotes omitted).

The thrust of these treatise explanations was acknowledged by our court in *Union Pacific Resources Co. v. State*, 839 P.2d 356, 370 (Wyo.1992), where we said in discussing the limits of a specific legislative delegation of authority to an agency:

> An administrative agency is limited in authority to powers legislatively delegated. *Hupp v. Employment Sec. Com'n of Wyoming*, 715 P.2d 223 (Wyo.1986); *Continental Pipe Line Co. v. Belle Fourche Pipeline Co.*, 372 F.Supp. 1333 (D.Wyo.1974). "Administrative agencies are creatures of statute and their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim." 1 Am.Jur.2d

*Administrative Law* § 70, at 866 (1962) (footnotes omitted).

We turn then to an examination of the authority delegated to the Commission by the legislature and compare that to the statutory assignment of the Department. The act creating the Wyoming Oil and Gas Conservation Commission as it now exists, and delineating its powers and duties, is found in WYO.STAT. §§ 30–5–101 to –126 (1983 and Supp.1994). The focus of this act is to enable the Commission to manage the production of oil and gas, a significant aspect of Wyoming's natural resources, in order to prevent waste. That emphasis is captured in WYO.STAT. § 30–5–102 (1983):

> (a) The **waste** of oil and gas or either of them in the state of Wyoming as in this act defined is hereby prohibited.

> (b) Whenever **in order to prevent waste** the commission limits the total amount of oil and gas which may be produced in any pool in this state to an amount less than that amount which the pool could produce if no restriction was imposed, the commission shall allocate or distribute allowable production among the several wells or producing properties in the pool on a reasonable basis, **preventing or minimizing reasonably avoidable drainage** from each developed area not equalized by counter-drainage, so that each property will have the opportunity to produce or to receive its just and equitable share, **subject to the reasonable necessities for the prevention of waste.** (Emphasis added.)

It is summarized in WYO.STAT. § 30–5–117 (1983):

> It is not the intent or purpose of this law to require, permit, or authorize the commission or supervisor to prorate or distribute the production of oil and gas among the fields of Wyoming on the basis of market demand. **This act shall never be construed to require, permit or authorize the commission, the supervisor, or any court to make, enter or enforce any order, rule, regulation or judgment requiring restriction of production of any pool or of any well except to prevent**

**waste and to protect correlative rights.** (Emphasis added.)

In order to implement this purpose, the Commission has jurisdiction over all persons and property, public and private; is charged with the duty of making investigations to determine whether waste exists or is imminent, or whether other facts exist, which justify or require action; is required to make rules, regulations and orders; and is given other specific authority, all to effectuate the purposes and intent of the act. WYO.STAT. § 30–5–104 (Supp.1994).[3] In succeeding sec-

---

3. WYO.STAT. § 30–5–104 (Supp.1994) provides:

(a) The Wyoming oil and gas conservation commission, herein called "the commission," has jurisdiction and authority over all persons and property, public and private, necessary to effectuate the purposes and intent of this act.

(b) The commission has authority and it is its duty to make investigations to determine whether waste exists or is imminent, or whether other facts exist, which justify or require action by it hereunder. The commission is authorized to enter orders following any investigatory hearings if properly noticed to operators, producers and processors under the provisions of the Wyoming Administrative Procedure Act [§§ 16–3–101 through 16–3–115] and rules of the commission.

(c) The commission shall make rules, regulations, and orders, and shall take other appropriate action, to effectuate the purposes and intent of this act.

(d) The commission has authority:

(i) To require:

(A) Identification of ownership of wells, producing leases, tanks, plants and drilling structures;

(B) The making and filing of reports, well logs, and directional surveys; provided, however, that logs of exploratory or "wildcat" wells marked confidential shall be kept confidential for six (6) months after the filing thereof, unless the owner gives written permission to release such logs at an earlier date;

(C) The drilling, casing, and plugging of wells in such manner as to prevent the escape of oil or gas out of one (1) stratum into another, the intrusion of water into an oil and gas stratum, the pollution of fresh water supplies by oil, gas, or salt water, and to prevent blowouts, cavings, seepages, and fires;

(D) The furnishing of a reasonable bond with good and sufficient surety, conditioned for the performance of the duty to plug each dry or abandoned well or the repair of wells causing waste;

(E) The operation of wells with efficient gas-oil and water-oil ratios, and to fix these ratios;

(F) Gauging or other measuring of oil and gas to determine the quantity and quality thereof;

(G) That every person who produces oil and gas in this state shall keep and maintain for a period of five (5) years within this state complete and accurate record of the quantities thereof, which records or certified copies thereof shall be available for examination by the commission or its agents at all reasonable times.

(ii) To regulate, for conservation purposes:

(A) The drilling, producing, and plugging of wells;

(B) The shooting and chemical treatment of wells;

(C) The spacing of wells;

(D) Disposal of salt water, nonpotable water, drilling fluids and other oil-field wastes which are uniquely associated with exploration and production operations;

(E) The contamination or waste of underground water;

(F) All aspects of oil mining operations provided that nothing herein shall limit the authority of state mining inspector. "Oil mining operations" means operations associated with the production of oil or gas from reservoir access holes drilled from underground shafts or tunnels.

(iii) To classify wells as oil or gas wells for purposes material to the interpretation or enforcement of this act, to make the determination of wells required by the Natural Gas Pricing Policy Act of 1978 [Natural Gas Policy Act of 1978], Public Law 95–621 [15 U.S.C. §§ 3301 through 3432, 42 U.S.C. § 7255] and to make any other determination of wells that be required by the United States department of energy;

(iv) When required, in order to protect correlative rights, to establish drilling units affording each owner an opportunity to drill for and produce as a prudent operator, and so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas or both in the pool and to restrict or limit the production of oil or gas from any well which is allowed, after the effective date of this act, as an exception to the location requirements of or as an additional well permitted under any order of the commission establishing drilling units for a pool or part thereof or of any general well spacing rule or order adopted by the commission for conservation purposes, upon such terms and conditions as the commission may determine, upon the commission's own motion or upon application of any interested person and after notice and hearing as provided by chapter 6, Wyoming Statutes 1957 [§§ 30–5–101 through 30–5–204], as amended, and by the commission's rules;

(v) To adopt rules and regulations to regulate the plugging, sealing or capping of seismic shot holes, and to require, and fix the amount of, bonds or deposits to ensure compliance

tions, the statutory scheme also encompasses: authority to prescribe rules of order or procedure for hearings; appointment of hearing examiners; requirements for hearings before the Commission; adoption of rules and regulations to govern drilling units; approval by the Commission of agreements involving recovery and unit operation; authorization to the Commission to sue violators of any rule, regulation or order of the Commission; and recover penalties. WYO.STAT. §§ 30–5–105 through 114 (1983). Significantly absent from the Commission's authority is any power to deal with taxation.

The closest the statutes come to any revenue function of the Commission is found in the provisions of WYO.STAT. § 30–5–116 (Supp.1994).[4] This section imposes an assessment on any oil or gas produced, transported or sold from Wyoming of eight-tenths

of one mill on the dollar. The Commission has no authority to adjust those amounts, and it is charged with collecting and remitting those funds to the state treasurer. The funds are designated for paying the costs and expenses incurred in connection with the administration and enforcement of the statutes describing the functions of the Commission.

We compare this authority with that of the Department acting through the State Board of Equalization (Board). The Department is the administrative agency responsible for dealing with taxation issues. The Board is charged with valuing crude oil and natural gas for the prior calendar year at a fair cash market value after the production process has been completed. WYO.STAT. § 39–2–208 (1994). The Department is vested with the authority to determine that fair cash market

with regulations governing all geophysical operations;

(vi) To regulate, excluding discharges permitted under the national pollutant discharge elimination system, the:

(A) Location, construction, operation and reclamation of all noncommercial reserve pits and produced water retention and emergency overflow pits used solely for the storage, treatment and disposal of drilling fluids, produced waters, emergency overflow wastes or other oil field wastes associated with the maintenance and operation of oil and gas exploration and production wells on a lease, unit or communitized area in such a manner as to prevent the contamination of the waters of the state;

(B) The noncommercial underground disposal into Class two [2] injection wells as defined under the federal Safe Drinking Water Act of salt water, nonpotable water and oil field wastes related to oil and gas production in such a manner as to prevent contamination of the waters of the state.

(vii) To use funds collected under W.S. 30–5–116(b) to plug wells and seismic holes and reclaim the surrounding area affected by them, if the commission is unable to enforce its regulations and laws requiring the owner, seismic contractor or hole plugger to plug and reclaim and if the owner, seismic contractor or hole plugger does not have an adequate bond to cover the cost of plugging and reclamation. Nothing in this paragraph shall be construed to create any liability by the state for failure to adequately plug or reclaim wells or holes. If oil field equipment appears to have been abandoned in the area of a well or hole which is plugged or reclaimed under this paragraph, the commission may, after notice and a hearing as provided in W.S. 30–5–105 and 30–5–

106 and a finding that the equipment is abandoned, dispose of the equipment. The commission may dispose of the equipment by public sale or by transferring it to the contractor who performs the plugging and reclamation for the commission. The transfer or proceeds of the sale shall be used to defray the cost of plugging or reclamation. The commission shall promulgate rules to implement this paragraph.

4. WYO.STAT § 30–5–116 (Supp.1994) provides:

(a) All monies collected by the commission or as civil penalties under the provisions of this act shall be remitted to the state treasurer for deposit in an earmarked revenue fund. Expenses incident to the administration of this act shall include expenses for capital construction and shall be paid out of the account. One half (½) of the money so collected may be expended as needed by the commission for capital construction purposes.

(b) There is assessed on the fair cash market value as provided by W.S. 39–2–208, of all oil and gas produced, sold or transported from the premises in Wyoming a charge not to exceed eight-tenths of one (1) mill ($.0008) on the dollar. The commission shall by order fix the amount of the charge in the first instance and may reduce or increase the amount as the expenses chargeable may require. **The amounts fixed by the commission shall not exceed the limit prescribed above.** It is the duty of the commission to collect all assessments. All monies collected shall be remitted to the state treasurer for deposit in an account within the earmarked revenue fund and used exclusively to pay the costs and expenses incurred in connection with the administration and enforcement of W.S. 30–5–101 through 30–5–119. * * * (Emphasis added.)

value, and it does so by applying either the comparable sales, comparable value, netback, or proportionate profits valuation method. WYO.STAT. § 39–2–208(d)(i)–(iv) (1994). After the assessment has been made, WYO.STAT. § 39–6–302 (1994) promulgates the excise taxes to be levied on all Wyoming minerals. The pertinent sections that apply to oil and gas are:

(a) Except as otherwise provided in subsection (h) of this section, there is levied an excise tax of two percent (2%) of the value of the gross product extracted upon the privilege of severing or extracting uranium, trona, coal except underground coal, petroleum, natural gas, oil shale or any other fossil fuel in the state. An excise tax of one and one-half percent (1½%) shall be levied on underground coal. The proceeds from this tax shall be deposited into the permanent Wyoming mineral trust fund except as otherwise provided by W.S. 39–6–305(b) and except for the period beginning March 15, 1988, and ending June 30, 1996 during which the proceeds shall be deposited as follows:

(i) One-fourth (¼) of the proceeds from coal (except underground coal), petroleum, natural gas, oil shale or any other fossil fuel shall be deposited into the budget reserve account;

(ii) All of the proceeds from uranium and trona shall be deposited into the budget reserve account.

(b) Except as otherwise provided in subsections (h), (s) and (t) of this section, in addition to the excise tax imposed by subsection (a) of this section there is levied an excise tax of two percent (2%) of the value of the gross product extracted upon the privilege of severing or extracting any valuable deposit in the state except stripper production and underground coal. An excise tax of one and one-fourth percent (1¼%) shall be levied on underground coal. The proceeds from this tax shall be deposited into the general fund.

\* \* \* \* \* \*

(g) Except as otherwise provided in subsections (h), (s) and (t) of this section, in addition to other excise taxes provided by this section there is levied a tax of two percent (2%) of the value of the gross product extracted upon the privilege of severing or extracting oil and gas.

\* \* \* \* \* \*

**(j) Tertiary production resulting from projects certified by the Wyoming oil and gas conservation commission after July 1, 1985 and before December 31, 1994, is exempt from two percent (2%) of the excise tax imposed by W.S. 39–6–302(b) for a period of five (5) years from date of first tertiary production.**

WYO.STAT. § 39–6–302 (1994) (emphasis added).

In addition, WYO.STAT. § 39–1–304(a)(iv) (1994) gives to the Board the authority to:

Decide all questions that may arise with reference to the **construction of any statute affecting the assessment, levy and collection of taxes,** in accordance with the rules, regulations, orders and instructions prescribed by the board; \* \* \*. (Emphasis added.)

██ A comparison of the roles of the Department and the Commission as established by the legislature demonstrates that the Department, acting through the Board, is vested with pervasive and sole authority over all aspects of the taxation of Wyoming citizens and business entities, including the construction of any statute affecting the assessment, levying, and collection of taxes. The Commission is empowered to adopt rules and regulations and act administratively to prevent waste and encourage the conservation of Wyoming's oil and gas resources. The Commission must make its decisions and promulgate its orders by its discerning conclusions as to what will either prevent or remediate waste.

██ It is apparent from the language of the Report of the Commission, quoted above, that the Commission refused to certify Kerr-McGee's tertiary recovery project based upon revenue implications. The Commission had no authority to base its decision on tax matters. Whatever the appropriate construction of WYO.STAT. § 39–6–302(j) might be, that construction is reserved for the Board. In invoking that statute as a premise

for its decision to not certify Kerr–McGee's tertiary recovery project, the Commission acted contrary to law and invaded an area in which it had no statutory right.

Despite the denial of advice by the Attorney General, there is a strong implication in this record that the order was premised upon advice either from the Department or from Attorney General staff. If that were so, we would be forced to conclude there had been a violation of the separation of powers doctrine. The agency is an arm of the legislature; the Attorney General is an office within the executive branch. Invasions of the separation of powers doctrine are far more likely to be subtle than apparent and direct. We commend the Attorney General for his early recognition of this concept in this instance.

As we analyze the statutory structure for the Commission and the Department, it is apparent the ruling of the Commission with respect to certification or non-certification of a tertiary recovery project has to be based upon whether the proposed project will prevent waste or promote the conservation of oil and gas resources pursuant to the statutory purposes justifying the creation of the Commission. Commissioner Basko's comment that he favored "a project that will squeeze additional oil out of the reservoir above the baseline in incremental oil * * *," creates a strong implication that, within the prerogative of the Commission, this project should have been certified.

If there should be some limitation upon the tax implications relating to such a project, that issue appropriately must be resolved when the Department endeavors to collect taxes. The agency charged with addressing the application of WYO.STAT. § 39–6–302(b) is the Department acting through the Board. We can discern no legislative intent that the revenue function in this instance is to be shared by the Commission.

We hold that the Commission acted contrary to law and without statutory authority when it premised its decision not to certify this project upon the application of a statute committed to the authority of the Department of Revenue. Accordingly, we reverse and remand the Report of the Commission for further proceedings in accordance with this opinion.