2006 WY 27

**BP AMERICA PRODUCTION COMPANY, f/k/a Amoco Production Company, Appellant (Petitioner),**

v.

**DEPARTMENT OF REVENUE, State of Wyoming, Appellee (Respondent).**

No. 04–157.

Supreme Court of Wyoming.

March 14, 2006.

Representing Appellant: John L. Bordes Jr., Robert A. Swiech, and Nicole Crighton of Oreck, Bradley, Crighton, Adams & Chase, Boulder, CO. Argument by Mr. Bordes.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; and Martin L. Hardsocg, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶1] Appellant, BP America Production Company (formerly known as AMOCO Production) (hereafter BP [1]), seeks review of an order of the district court that affirmed actions taken by the State Board of Equalization (SBOE). BP raises sixteen issues for our consideration and they are set out in detail below. The Department of Revenue's (DOR's) take on the issues is somewhat different and those issues are also set out in detail below. We will affirm the district court and the SBOE.

## ISSUES

[¶2] BP articulates these issues:

### A. PROCEDURAL

1. Did the district court commit reversible error when it affirmed the Board's Order granting Sweetwater County's request for intervention?

a. Did the court abuse its discretion when it failed to strike from the record at the Board the County's testimony?

2. Was the district court's decision without observance of procedure required by law when it affirmed the Board's reallocation of oil values and its authorization for the "collection" of ad valorem taxes based on partial mill levies?

### B. SUBSTANTIAL EVIDENCE

3. Was the district court's decision holding wellhead reporting was the only approved method under the facts of this case supported by substantial evidence and otherwise in accordance with law?

4. Was the district court's determination that Amoco's Wertz Dome Unit allocation method was unreasonable supported

---

1. BP will also be referred to as Amoco in some quoted material.

by substantial evidence and neither arbitrary, capricious, an abuse of discretion nor contrary to Wyoming law?

5. Was the district court's refusal to consider W.S. 39–2–214 supported by substantial evidence contained in the record and otherwise in accord with Wyoming law?

6. Was the district court's decision concluding that the events triggering the Department's reallocation occurred before the enactment of W.S. § 39–2–211(j) on March 20, 1990 supported by substantial evidence?

## C. STATUTORY

7. Did the district court commit reversible error when it held no Wyoming statute precluded the Department's revaluation for production years prior to 1985?

8. Did the district court commit reversible error when it held W.S. § 39–3–102(b) did not apply to the "collection" of ad valorem personal property taxes by the county under the undisputed facts in this case?

9. Did the court commit reversible error when it relied on W.S. § 39–1–304(a)(xiv) and *Wyoming State Tax Commission v. BHP, Petroleum Co. Inc.*, 856 P.2d 428, 436–37 (Wyo.1993) as authority for affirming the Department's actions?

10. Did the court commit reversible error when it relied on *Union Pacific Resources Co. v. State*, 839 P.2d 356, 361 (Wyo.1992) for its decision that no statute of limitations restricts the "collection" of unpaid ad valorem personal property taxes due on mineral production?

## D. RETROSPECTIVE/PROSPECTIVE APPLICATION

11. Did the court commit reversible error when it held W.S. § 39–2–201(j) required retrospective application?

12. Did the court commit reversible error when it failed to apply existing law in its decision on appeal dated June 18, 2004?

## E. UNITED STATES AND WYOMING CONSTITUTIONS

13. Does the court's decision violate Article 15, sections 3 and 11 of the Wyoming Constitution?

14. Does the court's decision violate the Fourteenth Amendment of the United States Constitution and Article 1, section 34 of the Wyoming Constitution?

## F. INTEREST

15. If the Final Determination issued February 28, 1994 is upheld, should interest be modified based on the facts of this case?

16. Did the court commit reversible error when it upheld the Board's imposition of interest on production years 1987 and 1988 when those production years were not included in the Final Determination Letter dated February 28, 1994 nor appealed by Amoco to the Board?

[¶ 3] DOR refines the issues to these:

1. Was the State Board's rejection of [BP's] production allocation method, because it was arbitrary and inaccurate, supported by substantial evidence?

2. Was the State Board's affirmation of the Department's requirement that Amoco report oil production on a wellhead basis and by county supported by substantial evidence?

3. Was Amoco statutorily required to use an allocation method which reflected a wellhead volume measurement and wellhead production location to report tax liability to the Department of Revenue?

4. Does the State Board's order allowing Sweetwater County to intervene require reversal of the State Board's and District Court's decisions affirming the Department of Revenue's determination that Amoco's oil production be reallocated and additional ad valorem taxes be paid?

5. Did the State Board and District Court properly affirm the Department's final determination that Amoco pay additional ad valorem tax to Sweetwater County totaling only the difference between applicable mill levies imposed in Carbon and Sweetwater

Counties between tax years 1981 through 1987?

6. Did the State Board and District Court correctly rule that WYO. STAT. § 39–2–201(j) did not bar the Department's final decision requiring Amoco to correct its 1981 through 1987 tax reports and to remedy misallocated production volumes?

7. Did the State Board and District Court correctly rule that WYO. STAT. § 39–2–214(a) did not bar the Department's final decision requiring Amoco to correct its 1981 through 1987 tax reports and to remedy misallocated production volumes?

8. Did the State Board and District Court correctly rule that WYO. STAT. § 39–3–102(b) did not bar the Department's final decision requiring Amoco to correct its 1981 through 1987 tax reports and to remedy misallocated production volumes?

9. Did the State Board and District Court correctly affirm the imposition of interest?

## FACTS AND PROCEEDINGS

[¶ 4] This is indeed a complex case, at least in a procedural sense. It is also complicated because the record is almost 3,000 pages in length. The Board Record, or Agency Record, accounts for almost 2,500 of those pages, and, for the most part, does not appear to be in any particular order. There is no index for the agency record. While the Department's brief is very helpful in parsing this lengthy record, it is apparent that BP's brief was designed as much to further obfuscate the record, as it was to portray the facts and proceedings in any organized fashion.

[¶ 5] While it is not a traditional sort of "fact," it is important to an understanding of this case that we take note of Wyo. Stat. Ann. § 39–2–201(e) (Michie 1985 and Michie 1977):

(e) Annually, on or before the dates hereafter indicated, or as soon thereafter as the taxable value is determined, **the board shall certify the valuation determined by the board to the county assessor of the *county in which the property is located,* to be entered upon the assessment rolls of the county:**

(i) June 1, **mines and mining claims,** pipeline companies, electric utilities and other public utilities; [Emphasis added.]

That statute continued forward into 1990. However, in 1990, Wyo. Stat. Ann. § 39–2–213 (Michie 1990) was enacted:

**§ 39–2–213. Location of production for reporting purposes.**

For mines and mining claims, the taxpayer shall report the location of the production to the county and tax district in which the well, mine or mining claim is located, based upon the actual taxable production produced by the well or mine in each county or tax district. Other reasonable methods of reporting the location of production may be approved by the department upon written request of the taxpayer, or taxing jurisdiction.[2]

[¶ 6] A significant part of BP's argument is that until 1990, there was no statute that required reporting of oil production at the wellhead. Continuing that argument, BP asserts that the 1990 amendment, which carries through to this day, specifies wellhead reporting and this circumstance bolsters BP's contention that prior to the 1990 enactment, wellhead reporting was not required.

[¶ 7] At the core of this controversy is the circumstance that production from BP wells located in Sweetwater County was being attributed to Carbon County. BP reported that production accurately to the Wyoming Oil and Gas Conservation Commission (WOGCC) for at least two of the years at issue here, but reported it differently to DOR for tax purposes. Of consequence in this regard is that the mill levy in Carbon County was significantly lower than the same sort of mill levy in Sweetwater County.

---

**2.** The current version of this statute is found at Wyo. Stat. Ann. § 39–14–207(a)(iii) (LexisNexis 2005):

(iii) For crude oil, lease condensate or natural gas, the taxpayer shall report the location of the production to the county and tax district in which the well or property is located, based upon the actual taxable production produced by the well or property in each county or tax district. Other reasonable methods of reporting the location of production may be approved by the department upon written request of the taxpayer or taxing jurisdiction;

Thus, Sweetwater County received less tax revenue than it should have, and Carbon County received more tax revenue than it should have.

[¶ 8] The Department has charitably characterized this misreporting of production as a form of tax avoidance scheme. BP, on the other hand, emphasizes that the Wertz Dome Unit straddles Carbon and Sweetwater counties, and that water was injected into the field so as to cause the oil to migrate toward wells. A water flood program changes the whole structure and pattern of a formation and can result in the production of oil that originated in one area of the formation in another. BP contends there was a "strong likelihood" that minerals were moving across county lines because of the water flood project: "In fact, because of the water flood project, the original location of the minerals is unclear, and the minerals were more on the character of a pool of reserves.[3]" During this time period, BP also directionally drilled wells so that a wellhead located in one county could have a bottom hole in another county.

[¶ 9] In a letter dated December 13, 1989, the Board of County Commissioners of Sweetwater County informed the Department of Revenue of these circumstances:

We reviewed oil production and sales from all wells operated by Amoco Production Company in the Wertz Dome unit in Sweetwater County, Wyoming for the years 1980 through 1988. We compared sales as reported by Amoco to the Mineral Tax Division (MTD) on forms ATD–4 (Annual Report for Oil and/or Gas Produced), with sales reported to the Wyoming Oil & Gas Conservation Commission (WOGCC) on their Form–2 (Operator's Monthly Report of Wells). It appears that not all county sales have been reported to the MTD which would result in additional taxes due the county. We respectfully request your assistance in the collection of these apparently unreported taxes.

[¶ 10] BP responded to that letter on May 8, 1990, stating:

We have reviewed the finding of the auditors retained by the Sweetwater County Board of Commissioners on the [Wertz Field]. Although the auditors reviewed production data back to 1980, we have limited our scope of review to the 1988 [ & 87] production years as a result of the passage of S.F. 83, Enrolled Act No. 48. [Wyo. Stat. Ann. § 39–2–201(j), infra.]

For the period in question, we have discovered that production has been reported from several wells to the incorrect county and taxing jurisdiction. In accordance to our findings, we have made the appropriate changes to reflect the recordings to proper leases. These changes are made on the ATD Form 4(b) attached hereto for your review.

Thus, BP recognized that its reports for tax years 1987 and 1988 were in error, but contended that the Department was statutorily prohibited from going back and considering tax years 1980–86.

[¶ 11] As is evident from the record, and as emphasized by BP, there is an apparent lull in the "proceedings" until 1994. In a letter dated February 28, 1994, the Department, through the MTD, informed BP that:

The Department has determined that Amoco Production Company improperly allocated production from the Wertz Dome Unit between Sweetwater and Carbon Counties for the 1980–1986 production years. Amoco was first notified of this discrepancy and directed to amend the related ad valorem gross products tax returns on December 14, 1989.

The attached schedules detail the revised allocation between the counties. It is the Department's understanding that Sweetwater County will bill Amoco only for the difference in mill levies between the two counties. See attached correspondence copies.

[¶ 12] BP appealed that determination in a letter dated March 28, 1994. Of central importance to that appeal was the enactment in 1990 of Wyo. Stat. Ann § 39–2–201(j) (Mi-

---

**3.** Pools of oil such as those at issue here are described as "fugacious:" "not fixed in a certain place: WANDERING (unlike other minerals ... oil and gas are ... ~—Robert Kratovil)." Webster's Third New International Dictionary 918 (1986).

chie 1990) (*and see* 1990 Wyo. Sess. Laws Ch. 52, § 2, p. 111). BP asserted that it had conversations with the "Department's [DOR's] Mineral Tax Division," and the "Chairperson at the Board [SBOE]" suggested that such legislation would "affect BP's liability, if any, to Sweetwater County" for the period 1980–86, and so BP limited its response to DOR's request to the years 1987 and 1988. That statute provided:

> (j) For mines and mining claims, the board may presume that the property is located in the county in which production is reported by the taxpayer pursuant to W.S. 39–2–208. The board shall not direct any county to provide relief for taxes paid on taxable valuation which was erroneously reported and certified to the wrong county unless the taxpayer files or is directed to file amended returns within two (2) years of the date of the original certification of the production. Unless there is evidence of bad faith or willful disregard of production circumstances, no taxpayer shall be required to pay taxes on production which was erroneously reported and certified to the wrong county if relief for taxes paid is not allowed under this provision.[4]

[¶ 13] The Board summarized the issue in that appeal like this:

> Was the DOR's [Department's] decision on review to change the allocation of petitioner's oil production from its Wertz Dome Unit for 1980 through 1988 between Carbon and Sweetwater counties supported by substantial evidence, according to procedures required by law, and neither arbitrary, capricious, nor inconsistent with law?

[¶ 14] The Board refused to give a retrospective application of Wyo. Stat. Ann. § 39–2–201(j) to BP's claims and generally affirmed the Department's determination. BP appealed that decision to this Court, and in our opinion we concluded that BP had been denied due process of law. Thus, we remanded to the Board so that it could conduct a contested case hearing. *Amoco Production Company v. Wyoming State Board of Equalization,* 7 P.3d 900 (Wyo.2000) (decided July 13, 2000, rehearing denied August 3, 2000).

[¶ 15] On September 6, 2000, Sweetwater County moved to intervene in these proceedings. The Board granted that motion on September 28, 2000. BP filed motions before the Board to vacate Sweetwater County's intervention, as well as to disqualify Sweetwater County's attorneys, but the Board denied all those motions. Following a three-day contested case hearing, the Board issued its Findings of Fact, Conclusions of Law, Decision and Order on September 5, 2001. On October 5, 2001, a petition for review under W.R.A.P. 12 was filed in the district court. Sweetwater County was not permitted to participate in this stage of the proceedings nor has Sweetwater County participated in any way in the appeal to this Court.

[¶ 16] We set out below the findings and conclusions reached by the Board on September 5, 2001:[5]

**DIGEST**

This matter was considered by the State Board of Equalization (SBOE) members, Edmund J. Schmidt, Chairman, Roberta Coates, Vice–Chairman, and Sylvia Hackl, Member, in a contested case hearing conducted from February 12, 2001, through February 14, 2001, pursuant to a hearing order dated October 19, 2000. Roberta Coates, Vice–Chairman, acted as hearing officer. This matter arises from a remand of an earlier SBOE decision dated May 19, 1999, by the Wyoming Supreme Court in *Amoco Production Company v. Wyoming State Board of Equalization,* 7 P.3d 900 (Wyo.2000). The remand occurred because counsel for Petitioner, an experienced counsel appearing before the SBOE, argued he was not accorded due process because he did not have an opportunity to develop facts. Counsel actively and will-

---

4. The current version of this statute is found at Wyo. Stat. Ann. §§ 39–13–103(b)(xv), 39–14–107(a)(iii), 39–14–207(a)(iv), 39–14–307(a)(iii), 39–14–407(a)(iii), 39–14–507(a)(iii), 39–14–607(a)(iii), and 39–14–707(a)(iii) (LexisNexis 2005).

5. Record references are in the parties' original findings, and we include them here for the convenience of our readers who may wish to examine the agency record.

ingly participated in an expedited handling of the case and had never objected to the expedited process until an adverse decision was rendered. The remand directed the SBOE to conduct a contested case hearing to promote full and fair development of the factual issues presented in the case.

The factual issues arise from a review conducted by a contract auditor at the request of the Sweetwater County Board of County Commissioners (Sweetwater County). The review examined 1980 through 1988 oil production from Petitioner's Wertz Dome Unit. Although the parties have identified many sub-issues, the issue is:

Was the Wyoming DOR decision to change the allocation of Petitioner's oil production from its Wertz Dome Unit for 1980 through 1988 between Carbon and Sweetwater Counties supported by substantial evidence, according to procedures required by law, and neither arbitrary, capricious, or inconsistent with law?

ALL STATUTORY CITATIONS USED IN THIS DECISION AND ORDER REFERENCE TITLE 39, PRIOR TO RECODIFICATION WHICH WAS EFFECTIVE MARCH 6, 1998.

**JURISDICTION**

The SBOE is mandated to review decisions of the DOR on assessments of property and tax determinations and to hold hearings after due notice pursuant to the Wyoming Administrative Procedures Act and prescribed rules and regulations. *Wyo. Stat.* § 39–1–304(a) and *Wyo. Stat.* § 39–1–304(a)(ix). An appeal from a DOR decision must be filed with SBOE within thirty (30) days of the final administrative decision at issue. *Rules, Chapter 2, § 5(a), Wyoming State Board of Equalization.*

The SBOE is required to "[d]ecide all questions that may arise with reference to the construction of any statute affecting the assessment, levy, and collection of taxes, in accordance with the rules, regulations, orders, and instructions prescribed by the department." *Wyo. Stat.* § 39–1–303(a)(iv).[6]

The Notice of Appeal was timely filed, and the SBOE has jurisdiction to hear the case. Sweetwater County filed a proper motion for intervention, and the SBOE entered an Order joining Sweetwater County in the case on September 6, 2000. The SBOE is required to decide all issues relating to this appeal and give a written decision, citing findings of fact and conclusions of law following a hearing. *Rules, Chapter 2, § 32, Wyoming State Board of Equalization.*

**DISCUSSION**

Petitioner filed an appeal with the SBOE challenging the DOR's reallocation of its Wertz Dome Unit 1980 through 1986 oil production between Carbon and Sweetwater Counties. For that period, the DOR determined, based upon a contract review performed by Rocky Mountain Auditing Services at the request of Sweetwater County, that Petitioner's oil production had been incorrectly reported as produced from Carbon County instead of Sweetwater County. For the time period at issue, Carbon County had a lower mill levy than Sweetwater.

The review findings were communicated to Petitioner who requested and was granted additional time to analyze the findings. During this period, Wyoming Statute § 39–2–201(j) was enacted. Thereafter, Petitioner asserted the newly enacted statute limited the DOR review to two years and filed amended returns for 1987 and 1988 production. Petitioner failed to respond to 1980 through 1986 review findings.

In addition to the alleged limitation in Wyoming Statute 39–2–201(j), Petitioner asserts: (1) for the time period at issue, the DOR permitted the use of varying allocation methodologies other than the methodology employed by Sweetwater County; (2) Petitioner's allocation methodology for production years 1980 through 1983 was reasonable and was reported to and accepted by the DOR; (3) the exclusive use of wellhead location (in the county

6. Although the statute has evolved somewhat since it appeared as Wyo. Stat. Ann. § 39–1–303 (Michie 1977), we refer our readers to Wyo. Stat. Ann. § 39–11–102 (LexisNexis 2005) for the broad delegation of responsibility and power given to the DOR.

where the oil is produced) as an allocation method is unreasonable for the Wertz Dome Unit; (4) there is no authority for the issuance of an assessment, or tax bill, based upon a mill levy difference between two counties; and (5) the tax has been proscribed.

The DOR asserts: (1) Wyoming Statute § 39–2–201(j) does not apply to this situation because it is not applied retroactively; (2) additional ad valorem taxes are due and owing to Sweetwater County because of its higher mill levy; and (3) actual well location is the best available indicator of an accurate reporting of production location particularly in the absence of any other reasonable basis for reporting production.

Intervenor Sweetwater County asserts: (1) Wyoming Statute § 39–2–201(j) does not apply: (2) neither the DOR nor petitioner has authority to exempt oil physically produced in Sweetwater County from its taxing authority by improper "allocation" to another county; (3) Petitioner lacks standing to contest Sweetwater County's proposal to afford it a credit for taxes paid to Carbon County; and (4) Petitioner owes statutory interest calculated from the date the taxes should have been paid had the production been properly reported to the correct taxing jurisdiction.

The evidence submitted with the parties' briefs does not indicate Petitioner has ever paid any additional ad valorem taxes to Sweetwater County.

It is important to note in this appeal Sweetwater County is not seeking to recover taxes for mis-allocated volumes. Rather, it is willing to accept the production mis-allocated to Carbon County as being reported to and taxes paid thereon to Sweetwater County. It is only asserting Petitioner owes additional ad valorem taxes on the amount attributable to Sweetwater County's higher mill levy.

### FINDINGS OF FACT

#### General Facts Common to All Issues:

1. Petitioner was the only working interest owner and operator of the wells at issue in the Wertz Dome Unit during the tax period. The tax period at issue is production years 1980 through 1986; tax years 1981 through 1987. [Stipulation 1].

2. The wells in the Wertz Dome Unit produce oil from the Madison and Tensleep formations, through wells located in Sweetwater County and Carbon County. [Stipulation 4]. The Madison is a limestone formation while the Tensleep is a tightly compacted sandstone formation. [Transcript Vol. 1, pp. 40–41].

3. During the period at issue, Petitioner was injecting water into the Wertz Dome Unit formations to induce pressure back into the reservoir and sweep oil to producing wells. [Transcript Vol. 1, pp. 41–45]. It is possible, through the injection process that, oil could be swept from one county and [be] produced in another depending on the permeability of the rock and the rate of water pressure. [Transcript Vol. 1, pp. 46–48].

4. For the tax period, Sweetwater County had a higher mill levy than Carbon County due to an increase for the Community College in Sweetwater County. The actual mill levy difference in Sweetwater County compared to Carbon Count's levy for the tax years at issue is the following, according to Exhibit 319:

    1981: 2.640 mills

    1982: 6.570 mills

    1983: 7.400 mills

    1984: 7.760 mills

    1985: 7.310 mills

    1986: 4.944 mills

    1987: 6.340 mills

5. An audit was performed by the Wyoming Department of Audit (DOA) for this time frame and included production from the Wertz Dome formation. This audit found the Petitioner had reported production to Carbon County which should have been reported to Lincoln County. [Transcript Vol. 1, p. 85]. The audit did not check to see if production was being reported to the correct county as between Sweetwater County and Carbon County. [Transcript Vol. 2, p. 231].

#### Whether Petitioner Reasonably Reported Production:

6. Petitioner did not measure oil volumes at the wellhead but it did measure the oil at the LACT[7] (custody transfer meters) unit located at three Wertz Dome Facilities. [Transcript Vol. 1, pp. 48, 58, 62]. Petitioner tested three producing wells at least twice a month. Then, using a representative well test of the actual daily volumes that were coming from each of the wells, and metering done at the LACT units, Petitioner was able to determine how much oil came from a particular well. Petitioner then allocated that volume of production back to the wells. [Transcript Vol. 1, pp. 48–49, 62–63, 67–68, 70–71, and 76]. The monthly production volume from each well was reported to the Wyoming Oil and Gas Conservation Commission (WOGCC) and the federal government. [Transcript Vol. 1, pp. 49, 70, 112]. The testing process resulted in a "pretty good number" for individual well production in that it was very close to actual metering results, with errors of maybe 2 or 3 percent. [Transcript Vol. 1, p. 103].

7. For production years 1980 through 1983, Petitioner allocated 34% of all oil produced from the Madison and Tensleep formations to Sweetwater County, and 66% of the production to Carbon County. [Transcript Vol. 2, p. 143, Exhibit 112]. We will refer to this allocation as the 66/34 split.

8. Petitioner could have generated for tax purposes the same production reports it generated for the WOGCC from the computers that generated the tax reports in Tulsa, Oklahoma. [Transcript Vol. 1, pp. 90, 101, 108, 126, 130].

9. The DOR had no written policy from 1980 through 1986 for allocation of downhole commingled production in two counties. The DOR accepted any reasonable method to allocate production between two counties [Transcript Vol. 1, p. 178]. The DOR accepted one method other than wellhead location for allocation of production. [Transcript Vol. 1, pp. 179–180]. The other allocation method was for the Anschutz Ranch Unit which allocated production in Utah to both Utah and Wyoming as deter-

mined by pore volumes, a sophisticated measurement of oil within a formation. The allocation of Anschutz Ranch was approved by the United States Bureau of Land Management. [Transcript Vol. 2, pp. 198–199].

10. Randy Bolles, the administrator of the DOR's Mineral Tax Division, correctly observed that Wyoming's tax system is a self-reporting system. Thus, the DOR had no way of knowing how Petitioner allocated production between counties at the time of filing of tax reports. [Transcript Vol. 3, pp. 134–136, 142].

11. For production years 1980 through 1983, Petitioner admits its reporting of production did not relate to actual production by well or group of wells. [Transcript Vol. 1, p. 92]. Petitioner also admits its reporting of production did not relate to any reservoir pore volume analysis, or to the ratio of the number of producing wells in each county compared to the total number of producing wells in the unit. [Transcript Vol. 1, p. 159, Vol. 2, pp. 139–140]. No person could explain the reason Petitioner used the 66/34 split. [Transcript Vol. 1, pp. 93, 122, 166, Vol. 2, pp. 136, 140]. Because the Unit agreement was developed in 1937, Petitioner surmised the 66/34 split allocation was devised because it was easy. [Transcript Vol. 2, p. 150].

12. Mr. Bruce Cartwright, the former tax representative for Petitioner, hypothesized the 66/34 split was based on a lease acreage basis of 40 acres per production well. However, this calculation results in 60% acreage in Carbon County and 40% in Sweetwater County. [Transcript Vol. 2, p. 99, Vol. 3 p. 168]. Because this calculation does not match the 66/34 split, we reject this explanation.

13. Petitioner opined that the 66/34 split could have been based on the unit agreement and its "recital" of lease-surface acreage, by county. [Transcript Vol. 1, pp. 141–143]. This was based on testimony of Mr. Paul Syring, a current employee of Petitioner, who went through Petitioner's records and attempted to recreate the rationale for the split; however, he did not

---

7. "LACT meter," is an acronym for "lease automatic custody transfer" meter.

have any first-hand knowledge of its origins. Mr. Syring did not know of anyone who could explain the split. [Transcript Vol. 1, pp. 165–166]. Petitioner's lease-surface acreage calculations were based on the wrong legal description for the unit. [Transcript Vol. 3, p. 169]. The recital of the unit agreement was incorrect and the actual lease surface acreage calculations were 60% to 40%. [Transcript Vol. 1, p. 168]. We therefore reject this explanation.

14. For production years 1980 through 1983, Petitioner produced a copy of a DOR document entitled "Form 1," ATD Form 1. This form purports to allow a taxpayer to group wells for tax reporting purposes, if approved by the DOR. The well groupings are based on the API numbers as assigned to each well by the WOGCC. Petitioner alleges this form was sent to the DOR in 1981. Petitioner also alleges the DOR accepted the form by a return mailing showing its approval. [Transcript Vol. 2, p. 27, Exhibit 137].

15. The well grouping report has an attachment identifying a list of wells, including those in the Wertz Dome Unit, with a hand-written notation suggesting production was to be split on a 66/34 basis. [Exhibit 137]. The instructions on the form indicate the well grouping must be in the same county. [Transcript Vol. 2, p. 80].

16. The well grouping report was introduced and admitted on the testimony of Mr. Cartwright who neither prepared nor filed the document, nor wrote the "alleged notation," nor witnessed its preparation, nor had any personal knowledge concerning when the notes in the document were made, nor had any personal knowledge about the processes that the DOR followed in 1981 concerning the submission and return of the well grouping report. [Transcript Vol. 2, pp. 27, 32, 163, Exhibit 137]. Mr. Cartwright was not employed by Petitioner at the time the well grouping report was filed, nor could he explain what the DOR did with the form. [Transcript Vol. 2, p. 163]. Although Mr. Cartwright testified he saw two copies of the well grouping report, and one was stamped by the DOR, Petitioner failed to introduce the stamped copy at the hearing. [Transcript Vol. 2,

pp. 39–40]. Petitioner did not produce the returned document showing the form or content of any DOR "approval" of the allocation. [Transcript Vol. 2, p. 39]. We reject the concept that the DOR accepted or approved the form due to lack of evidence. The only support for the proposition that the DOR approved the form was the testimony of a witness not employed by Petitioner when the form was supposedly submitted.

17. The tax form instructions on the ATD Form 4 directed a producer to record the quantity of gas as measured at the wellhead. [Transcript Vol. 2, p. 126].

18. The API number assigned to a well by the WOGCC identifies the location of the well by the state and the county. The API number is important to identify the location of a well. [Transcript Vol. 1, pp. 106–107]. All wells must be in the same field as assigned by the WOGCC, in the same county and in the same taxing district to be in a group. [Transcript Vol. 1, p. 191, Vol. 3, p. 58, Exhibit 334, exhibit 137].

19. Well groupings were allowed by the DOR for the convenience of the taxpayer in reporting. [Transcript Vol. 1, p. 111, Vol. 2, p. 20]. One reason to file an ATD Form 1 was to identify production to the proper taxing jurisdiction and county. [Transcript Vol. 2, pp. 88–89].

20. Ad valorem taxes are a tax on production, which Petitioner acknowledged. [Transcript Vol. 1, p. 153]. However, a royalty owner agreement to split production has no relevance to property taxes because oil should be taxed where it is produced. [Transcript Vol. 2, p. 98].

21. This SBOE declines to accept the well grouping report as proof of the DOR's "approval" of Petitioner's allocation, nor do we find the document binding on the DOR because of the exhibit's lack of foundation, and Petitioner's inability to provide a rational explanation of the 66/34 split.

22. No other taxpayer allocates oil production on a lease acreage basis or allocates production on a flat percentage. [Transcript Vol. 3, p. 147].

23. Petitioner used four different methods for allocating production from the Wertz Dome field between Sweetwater and Carbon counties. [Transcript Vol. 3, p. 108]. For the 1984 year Petitioner reported volumes of production according to producing well locations for the Madison formation production and used the same percentage for the Madison formation in 1985. Petitioner reported volumes to the DOR in 1984 and 1986 according to producing well location in the Tensleep formation and a completely unexplained percentage for 1985. [Exhibit 300, 501]. No witness for Petitioner could explain why different methods were used. For production years 1984 through 1986, Petitioner asserts its reporting by allocation for these production years was "a mistake" and in error. [Transcript Vol. 1, pp. 133, 141–142, Vol. 2, pp. 43, 147, 150–51].

24. In the late 1980's, Sweetwater County contracted with Mr. Richard W. Ryan of Rocky Mountain Auditing Services to conduct an audit of Amoco's production in Sweetwater County. [Transcript Vol. 3, pp. 74–75, 77].

25. Mr. Ryan could not ascertain a legal or factual basis for allocating Wertz Dome oil production from both formations on the basis of a 66/34 split for production years 1980 through 1983. [Transcript Vol. 3, pp. 167–68].

26. During the course of the audit, Mr. Ryan compared the production Petitioner reported for tax filings on Form ATD-4, with the production reported on Form 2 to the WOGCC. [Transcript Vol. 3, pp. 77, 165]. He determined Petitioner had reported production from wells located in Sweetwater County to Carbon County for tax purposes. [Transcript Vol. 3, p. 80–81].

27. Mr. Ryan reallocated Petitioner's production for Wertz Dome on the basis of where the wells actually produced, and how much each of those wells produced, as reported to the WOGCC. [Transcript Vol. 3, pp. 85, 162, 175]. In determining the reallocation Mr. Ryan took into consideration instances on both sides of the county line where a surface location might be different than bottomhole location. [Tran-

script Vol. 3, p. 103]. Thus, Carbon County was assigned production from a well located in Carbon County despite the fact that the downhole of the well was located in Sweetwater County. [Transcript Vol. 3, p. 174]. Mr. Ryan also checked the status of each well to determine if it was an injection well or a production well according to information reported by Petitioner to the WOGCC. [Transcript Vol. 3, pp. 174–75]. As a result of the reallocation, Ryan estimated that Petitioner failed to report to Sweetwater County taxable value of $8,615,796 for production from the Madison formation for production years 1980 through 1988, and $72,188, 837 for production from the Tensleep formation for production years 1980 through 1988 [Exhibit 501]. Ryan's calculations contained a minor error because they included some production in the Lakota and Flathead fields. [Transcript Vol. 1, p. 88].

### The Effect of Wyoming Statute § 39–2–201(j):

28. Prior to the passage of Wyoming Statute § 39-2-201(j) and before the Petitioner responded to the DOR, the tax representative for Petitioner, Mr. Bruce Cartwright, claimed to have consulted with the Chairperson of the SBOE. [Transcript Vol. 2, pp. 55–56]. It was Mr. Cartwright's understanding that pending legislation would affect Petitioner's tax liability for the mis-allocated reports. [Transcript Vol. 2, pp. 58–59]. No exhibits or writings were introduced to corroborate Mr. Cartwright's memory. Petitioner did not request a ruling from the DOR about the retroactivity of the statute pursuant to Wyoming Statute § 39–6–304(j). [Transcript Vol. 2, pp. 192, 210].

29. Wyoming Statute § 39-2-201(j) became effective on March 20, 1990, and reads as follows:

[Text of statute omitted, see infra.]

31. [Sic, no ¶ 30] There was no evidence that Carbon County's value was reduced, or that Carbon County was ordered to provide tax relief to the Petitioner. [Transcript Vol. 2, p. 170]. The only amount requested of Petitioner is the difference, due to the different mill levies. There is

no showing Carbon County would be harmed by Petitioner paying the difference. [Exhibit 508].

*Whether Interest Should Accrue:*

32. Fifty percent (50%) of ad valorem tax is due and payable on November 10th of the year following the production year in question, and the remaining fifty percent (50%) of the tax is due and payable on May 10th of the succeeding calendar year. *Wyo. Stat. § 39-3-101(a).*[8]

33. On December 13, 1989, Mr. Ryan brought his findings to the DOR. The DOR forwarded the findings to Petitioner by way of letter dated December 14, 1989. [Stipulations 10, 11: Exhibits 112-114]. The DOR letter directed Petitioner to review its records and explain the apparent discrepancies or amend its reports. [Exhibit 114].

34. On January 9, 1990, Petitioner requested an additional sixty days to respond to the auditor's findings. [Exhibits 302, 503]. On January 11, 1990, the DOR granted Amoco's request and gave Petitioner until March 9, 1990, to respond. [Exhibits 503, 504].

35. On May 8, 1990, Petitioner responded and admitted the production had been reported to the wrong county "for the period in question" but refused to amend its filings for years prior to 1988 and 1987 because of the enactment of Wyoming Statute § 39-2-201(j). The Petitioner did change its filings in accordance with the auditor's findings and filed amended returns for 1987 and 1988 production using the same allocation the auditor found. [Exhibits 120, 505]. Petitioner did not address the 1980 through 1986 production issue and did not provide an explanation for the earlier years allocation. The Petitioner did not provide the ATD Form 1, well grouping report, in response to the DOR inquiry. [Transcript Vol. 3, p. 55].

36. On July 2, 1990, the SBOE issued Special Directive 90-355 to Sweetwater and Carbon Counties dealing with 1987 and 1988 production. [Exhibit 506].

37. On February 28, 1994, the DOR sent a final determination letter to petitioner demanding additional taxes be paid to Sweetwater County as a result of the wrong allocation for tax years 1981 through 1987. [Exhibit 108]. There is no explanation for the four year delay from Petitioner's response to the DOR final determination. [Transcript Vol. 3, p. 62]. The final determination letter was an appealable communication and Petitioner filed the instant appeal. [Transcript Vol. 2, p. 207].

38. On February 28, 1994, the DOR advised Sweetwater County there was additional taxable value attributable to Petitioner for tax years 1981 through 1987 as a result of reallocation. The DOR understood Sweetwater County would only bill for the difference in mill levy between Carbon County and Sweetwater County. [Exhibits 115, 307, 508].

39. On October 21, 1997, Sweetwater County sent a letter to Amoco demanding the additional mill levy monies and interest. [Exhibit 311].

40. On June 7, 1999, Sweetwater County sent another tax bill. [Exhibit 319, Transcript Vol. 3, pp. 20-21].

41. Petitioner has not made any payments to Sweetwater County for the 1980 through 1986 production years. [Transcript Vol. 3, p. 22].

42. Any Conclusion of Law below which includes a finding of fact may also be considered a Finding of Fact, and is therefore incorporated herein by this reference.

## CONCLUSIONS OF LAW

*General Conclusions of Law*

43. The letter of appeal by Petitioner was timely filed and this SBOE has jurisdiction to determine this matter.

44. The Petitioner has the burden of going forward and the ultimate burden of persuasion. *Rules, Chapter 2, § 19, Wyoming State Board of Equalization.*

*The Applicability of Wyoming Statute § 39-2-201(j)*

---

**8.** The current version of this statute is found at Wyo. Stat. Ann. §§ 39-13-107(b)(i)(D), 39-14-107(b)(ii), 39-14-307(b)(ii), 39-14-407(b)(ii), 39-14-507(b)(ii), 39-14-607(b)(ii), and 39-14-707(b)(ii) (LexisNexis 2005).

46. [sic, there is no ¶ 45] Our threshold inquiry is whether or not Wyoming Statute § 39–2–201(j) is applicable as asserted by Petitioner. Wyoming Statute section § 39–2–201(j) was enacted by Chapter 52 of the 1990 Wyoming Session Laws. This law was signed on March 20, 1990, and reads as follows:

[Text of statute omitted, see infra.]

We hold this statute does not affect the tax liability of Petitioner.

47. We conclude Wyoming Statute § 39–2–201(j) does not apply to preclude the action taken by DOR in 1994. In 1989 the DOR demanded that Petitioner respond to allegations of mis-allocation of oil production between Sweetwater and Carbon Counties. The production, the discovery of the mis-allocation and the notice of the mis-allocation all occurred prior to the enactment and effective date of Wyoming Statute § 39–2–201(j).

48. Retrospective application of statutes to events occurring before their enactment is not favored. *Johnson v. Safeway Stores, Inc.,* 568 P.2d 908 (Wyo.1977); *State ex rel. Lynch v. Board of County Commissioners,* 75 Wyo. 435, 296 P.2d 986 (Wyo.1956); *Mustanen v. Diamond Coal & Coke,* 50 Wyo. 462, 62 P.2d 287 (Wyo. 1936).

49. Wyoming Statute § 8–1–107 provides in relevant part "[i]f a statute is repealed or amended, the repeal or amendment does **not** affect pending actions, prosecutions or proceedings, civil or criminal. . . ." (Emphasis added).

50. The events triggering the reallocation and consequential increased liability for taxes occurred long before the March 20, 1990, effective date of Wyoming Statute § 39–2–201(j). The production occurred prior to the effective date, the demand for an explanation occurred prior to the effective date, and therefore Wyoming Statute § 39–2–201(j) would have to be retroactively applied for Petitioner's argument to be valid.

51. It is a well established rule in Wyoming law that statutes are not applied retroactively unless retroactivity is expressly provided for in the statute. *Edgcomb v. Lower Valley Power & Light,* 922 P.2d 850, 859 (Wyo.1996).

52. In any event, even if Wyoming Statute § 39–2–201(j) were retroactive, it would not preclude the actions of the DOR. The production reported from 1980 through 1986 was not reported pursuant to Wyoming Statute § 39–2–208, therefore Wyoming Statute § 39–2–201(j) is not applicable.

53. Wyoming Statute § 39–2–201(j) does not create a statute of limitations for the benefit of a taxpayer, nor does it shield a taxpayer from being required to review discrepancies and file amended returns. Wyoming Statute § 39–2–201(j) protects counties from valuation adjustments and budget problems caused by late-filed amended returns that shift production from one county to another.

54. There is nothing in the record showing that the DOR directed Carbon County to provide any relief for taxes paid. The only taxes at issue are the higher mill levies in Sweetwater County.

55. Mr. Cartwright testified that a past Chairman of the SBOE thought Wyoming Statute § 39–2–201(j) would apply retroactively to the case at hand. [See Finding of Fact No. 21]. We find no authority to hold the DOR and Sweetwater County are estopped from collecting taxes or that they are bound by statements not made in writing.

56. Petitioner could have requested an interpretation of Wyoming Statute § 39–2–201(j) in accordance with Wyoming Statute § 39–6–304(j).[9] Petitioner knew of procedures but failed to ask for an interpretation. The record is thus void of the required elements of equitable estoppel.

***The DOR's Allocation by Well Location Was Reasonable***

57. Our next inquiry is whether the DOR's action in reallocating Petitioner's

---

9. The current version of this statute is found at Wyo. Stat. Ann. §§ 39–14–109(a)(ii), 39–14–209(a)(ii), 39–14–309(a)(ii), 39–14–409(a)(ii), 39– 14–509(a)(ii), and 39–14–609(a)(ii) (LexisNexis 2005).

Wertz Dome Unit oil production between Carbon and Sweetwater Counties is reasonable, not arbitrary, capricious or an abuse of discretion, and in accordance with law.

58. The SBOE has held that a taxpayer, by statute, has a duty to fully and accurately report all production volumes. *PG & E Resources Company*, BOE Docket No. 95–35 (Nov. 10, 1992).

59. Petitioner offers various theories why the original allocation was reasonable. Petitioner reported the allocation for three of the years on a 66/34 split. Petitioner attempts to explain the split as based on lease acreage or due to a grouping request. We reject the Petitioner's explanation and find the DOR reallocation was the only reasonable method of determining tax liability in this case.

60. The DOR and the SBOE have the responsibility to correct errors which are disclosed in an audit. *Amax Coal v. State Board of Equalization*, 896 P.2d 1329, 1334–1335 (Wyo.1995). *See also, Thunder Basin Coal Company v. State Board of Equalization*, 896 P.2d 1336 (Wyo.1995).

61. Based on the rule of *Amax, supra,* we hold the DOR has the authority and corresponding duty to correct Petitioner's erroneous reporting of its Wertz Dome Unit oil production for the period 1980 through 1988 on the basis of the contract audit performed at the request of Sweetwater County.

62. Accordingly we hold the DOR's decision to correct Petitioner's reporting for the period 1980 through 1986 to reflect reporting on a well location basis is supported by substantial evidence, is in accordance with procedures required by law, and is neither arbitrary, capricious, nor inconsistent with law.

63. Petitioner has failed to meet its burden of proving it accurately reported its production to the proper county. We base this on the record:

a. Petitioner's production reports of [to] the DOR were different from its own filings with the WOGCC;

b. Petitioner's reports were not based upon actual production;

c. The method petitioner used to allocate production might not reflect the actual production during the years in question;

d. The actual percentage of producing wells in the counties might be different from that which petitioner reported for that county; and

e. Petitioner could not identify a rational and consistent basis for how it allocated production between Sweetwater and Carbon Counties.

**A. It was not reasonable to allocate the production on a lease acreage basis.**

64. Petitioner allocated production during tax years 1980 through 1983 on the 66/34 split. [See Finding of Fact No. 7]. None of Petitioner's witnesses could explain the rationale for the split. Petitioner changed its reported allocation in 1984 forward and this was characterized as a "mistake" and an "error." [See Finding of Fact No. 24]. Petitioner failed to prove its allocation between Sweetwater and Carbon Counties was accurate.

65. Wyoming statutes provide that all taxable property shall be valued and assessed for taxation in the county in which the property is located. *Wyo. Stat. §§ 39–2–101(a)(i)*[10] *and 39–2–201(e)*.[11] The DOR's regulation provides taxable value is to be certified to the county in which the mine or mining claim is located and that "mine or mining claim" shall mean any property which produces a mineral. *Rules, Chapter XXI, Sec. 4(g) and 11(c), Department of Revenue.* Wyoming Statute § 39–2–202(a) provides for production to be valued for tax purposes "at the mouth of the mine where produced, after the mining or production process is completed." Wyoming Statute § 39–2–

---

**10.** The current version of this statute is found at Wyo. Stat. Ann. § 39–13–103(b)(i)(A) (LexisNexis 2005).

**11.** The current version of this statute is found at Wyo. Stat. Ann. §§ 39–13–102(*o*), 39–14–102(d), 39–14–202(a)(iii), 39–14–302(d), 39–14–402(c), 39–14–502(c), 39–14–602(c), and 39–14–702(d) (LexisNexis 2005).

202(b)(i) [12] defines "mouth of the mine" as "the point at which a mineral is brought to the surface of the ground." The law applicable to the production years at issue permitted allocation by well location. In fact, Petitioner used well location to allocate some of its production. It was appropriate for the DOR to conclude that allocating production by well location was permitted by law.

66. Petitioner failed to provide the DOR with information as to how it allocated production. It failed to provide information in 1990 and did not produce information during the discovery phase of the instant contested case. Under cross-examination by counsel for Sweetwater County, the Petitioner's tax representative, Mr. Cartwright, admitted the 66/34 allocation used for 1980 through 1983 had nothing to do with the volumes produced from the wells in the specific groups. He likewise admitted the allocation had nothing to do with hydrocarbon pore volume analysis nor with any ratio of producing wells to the total number of wells contained in the Wertz Dome Unit. Moreover, he admitted that the company's reports for 1984 through 1985 were in error. [See Finding of Fact 11].

67. Mr. Cartwright attempted to explain the 66/34 ratio by stating that it was derived from a calculation based on the amount of acreage in the Wertz Dome Unit that lies within a particular county. He testified he personally had not made that calculation and was unable to do so without the notes of someone else who had made the calculation. He also testified that by attributing a 40 acre parcel to each well in the Unit, he had arrived at approximately a 60/40 split, although he admitted this rough calculation was many years after the tax years in question and the unit had changed substantially. Mr. Syring, another of Petitioner's witnesses also attempted to explain the split using the lease acreage recital in the lease agreement, but this description did not accurately describe the lease acreage contained within the Wertz

Dome Unit and thus his calculation was flawed. The SBOE concludes that Petitioner was unable to satisfactorily explain how the 66/34 split was derived[, and] [r]elied on a couple of unauthenticated, handwritten notes by an unidentified source.

### B. Grouping Request Form.

68. Petitioner argued a well grouping request form that it submitted in January 1981, to the DOR was the document that set forth the 66/34 split and was the document used by the DOR to approve the allocation. [Exhibit 137]. We do not accept the allegation that this form was actually used by the DOR for the purpose which Petitioner alleges, that is, to approve a hand-written note on the allocation of production between Carbon and Sweetwater Counties. First, there was no evidence such form was in the DOR's records. Second, the form introduced into evidence by petitioner had no written verification on the form indicating approval by the DOR or even that it had been seen by the DOR. Finally, the well grouping request form was never produced in 1990 when the DOR originally requested Petitioner review its records and provide an explanation as to how the production was reported.

69. Even if the SBOE was to agree with Petitioner's assertion that the DOR approved and accepted the well grouping request form, the handwritten allocation on the form by an unidentified employee of Petitioner would not automatically indicate approval to the allocation method because the form's instructions were to group wells in the *same county.* [Emphasis in original.] The form represented that the wells were in the same county and the legal descriptions seem to indicate that all Wertz Dome Unit wells located in Range 89 West were in Carbon County while wells located in Range 90 West were located in Sweetwater County. Since an ATD–4 form, which is the tax form used to report the volumes and values to DOR, required volumes to be measured at the wellhead, any other method of reporting

---

12. The current version of this statute is found at Wyo. Stat. Ann. §§ 39–14–101(a)(vi), 39–14–301(a)(vi), 39–14–401(a)(vi), 39–14–501(a)(vi), 39–14–601(a)(vi), and 39–14–701(a)(vi) (Lexis-Nexis 2005).

production would have been a departure from the forms.

### C. Conclusion.

70. Petitioner failed in its burden of proof to demonstrate that the DOR's allocation based on well location was incorrect. In the absence of a statute permitting tax reporting by allocation, Petitioner's duty was to report its production where produced, not where "allocated." There is no evidence Petitioner reported its severed oil where it was located and produced for production years 1980 through 1983. Consequently, Petitioner failed to demonstrate the DOR's allocation of production on the basis of well location was unreasonable or inconsistent with law.

71. The DOR's allocation decision is reasonable and supported by the record. Petitioner acknowledged that it could report its production by well location as it did to the WOGCC. [See Finding of Fact No. 6].

72. Petitioner failed in its duty to fully and accurately report its Wertz Dome Unit production for the period 1980 through 1988.

73. Because Petitioner has filed amended returns for its 1987 and 1988 Wertz Dome Unit production, and because the DOR has not contested those returns we hold Petitioner's reporting for those years is correct.

### Ability to Pay Mill Levy Difference

74. Petitioner argues Sweetwater County may not issue a tax bill which reflects only the mill levy difference between Carbon and Sweetwater Counties. Sweetwater County is in effect granting a credit for taxes paid to another taxing authority, resulting in a tax bill reflecting the difference in mill levies. There is no authority holding that Sweetwater County cannot give such a credit in law or in equity.

75. Petitioner complains about receiving credit for taxes paid to Carbon County. Petitioner benefits from this situation and is not harmed. Therefore, Petitioner lacks standing to assert a claim of error associated with tax dollars it cannot claim, and therefore lacks standing to advance this

argument. *Board of Com'rs v. Searight Cattle Co.*, 3 Wyo. 777, 31 P. 268, 273 (1892); *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 40 [70] L.Ed.2d 700 (1982); *State ex rel. Bayou Liquors, Inc. v. City of Casper*, 906 P.2d 1046, 1048 (Wyo.1995).

### Audit by Sweetwater County Instead of Department of Revenue

76. Petitioner claims the demand for additional taxes must fail because Sweetwater County performed the audit. The Wyoming Supreme Court has already acknowledged the practice of the DOR accepting the work of a county auditor and assessing accordingly. *Union Pacific Resources Co. v. State*, 839 P.2d 356, 378–81 (Wyo.1992).

77. The record reflects the DOR independently reviewed the work of the Sweetwater County auditor and made an independent inquiry. The DOR met independently with the Petitioner, as reflected by the notes of the meeting contained in Exhibit 120.

### The Forms Used by the DOR to Notify the Petitioner and Sweetwater County Were Unusual

78. Petitioner claims the forms used to notify Sweetwater County of a change, and the form notifying Petitioner of the additional tax are not the typical forms used, and therefore the claim for additional taxes must fail. Petitioner timely filed an appeal of the letter. The DOR sent a notice of valuation change on the same day. [Exhibit 508]. Therefore, Petitioner experienced no harm or prejudice and fully understood the need to appeal. In fact the Petitioner is making the same form-over-substance argument that was rejected by the Wyoming Supreme Court in this controversy. *Amoco Production Company v. Wyoming State Board of Equalization*, 7 P.3d 900, 904 (Wyo.2000).

### Limitation on Collection of Delinquent Taxes

79. Petitioner argues Wyoming Statute § 39–3–102(b) [13] restricts or "proscribes"

---

**13.** The current version of this statute is found at Wyo. Stat. Ann. § 39–13–110(a) (LexisNexis

Sweetwater County's right to collect delinquent taxes. This statute provides:

> Annually, the county treasurer shall declare any taxes remaining unpaid on May 11 delinquent, and on or before May 21 shall certify a list of delinquent taxes and taxpayers, indicating the years for which payment is delinquent, which constitutes the delinquent tax roll or list of the county for the years covered thereby. The county treasurer shall stamp upon each line of the delinquent tax roll "Delinquent May 11, 19 . . ." but failure to do so does not invalidate subsequent collection proceedings. All personal property taxes not collected within ten (10) years from the time the taxes were levied shall be canceled and are thereafter uncollectible.

80. The statute limiting the collection of delinquent taxes does not apply to unreported taxes in a self-reporting system. An important case in understanding that statutes of limitation generally do not apply to tax collection is *Union Pacific Resources Co. v. State*, 839 P.2d 356 (Wyo. 1992). In that case, the court cited Wyoming constitutional provision Article 3, § 40 for the proposition that there is no statute of limitations for mineral tax collections. *Id.* at 369.

81. The record clearly shows Petitioner was notified about the taxes due by the contract auditor for Sweetwater County. Applying Wyoming Statute § 39–3–102(b) would result in rewarding Petitioner for its failure to properly report and pay taxes.

**Failure to Send a Tax Bill**

82. Petitioner claims Sweetwater County's failure to issue a tax bill is a fatal flaw. The tax statute creates the liability on the taxpayer to pay a tax bill, not the county's issuance of a bill. The statute prescribes the amount to be paid. *Moncreif [Moncrief] v. Wyoming State Board of Equalization*, 856 P.2d 440 (Wyo.1993). Wyoming statutes are clear that a tax notice or

demand for payment is not necessary to create a tax liability. Wyo. Stat. § 39–3–101(e).[14]

**Interest on Taxes**

83. The assessment of interest in this matter is authorized by Wyoming Statute § 39–3–101:[15]

> (a) Taxes provided by this act are due and payable at the office of the county treasurer of the county in which the taxes are levied. Fifty percent (50%) of the taxes are due on and after September 1 and payable on and after November 10 in each year and the remaining fifty percent (50%) of the taxes are due on and after March 1 and payable on and after May 10 of the succeeding calendar year except as hereafter provided. If the entire tax is paid on or before December 31, no interest or penalty is chargeable.

> (b) The balance of any tax not paid as provided by subsection (a) of this section is delinquent after the day on which it is payable and shall bear interest at eighteen percent (18%) per annum until paid or collected.

84. The interest obligation is modified by the requirement that the taxpayer knows or should reasonably know the entire tax liability, or the correct valuation for assessment, when the tax is due. *Kunard v. Enron Oil & Gas Co.*, 869 P.2d 132 (Wyo. 1994); and *Moncrief v. Wyoming State Bd. Of Equalization*, 856 P.2d 440 (Wyo.1993). Therefore, to determine if interest accrues, the SBOE is compelled to determine if the taxpayer knew or should have known the production should have been reported to Sweetwater County instead of Carbon County.

85. We feel it is necessary to examine each tax year and intervening periods to determine if interest should accrue.

86. For production years 1980 through 1983, Petitioners reported its production on the 66/34 split. Interest would accrue

---

2005).

**14.** The current version of this statute is found at Wyo. Stat. Ann. §§ 39–14–107(b)(i), 39–14–207(b)(i), 39–3–307(b)(i), 39–14–407(b)(i), 39–

14–507(b)(i), and 39–14–607(b)(i) (LexisNexis 2005).

**15.** The current applicable statute is now Wyo. Stat. Ann. § 39–14–108(c) (LexisNexis 2005).

for tax years if there was a showing the Petitioner knew or should have known tax was due to Sweetwater County. We believe Petitioner did not know of the tax problem until the letter of inquiry from the DOR dated December 14, 1989. However, we believe Petitioner did not take reasonable steps to address its tax problem after notification. Therefore, interest should accrue on the 1980 through 1983 additional tax obligation from the date Petitioner acknowledged the receipt of the DOR's letter, January 9, 1990, until paid. [Exhibits 302, 503].

87. For production years 1984 through 1986 the record indicates that petitioner paid its tax obligation based on well location, at least for a portion of the time. This action indicates that petitioner had knowledge of the proper tax reporting method. For those times and fields when taxes were paid on well location, no interest is due. For the tax years and fields when taxes were not paid based on location, interest is due from the date the taxes should have been paid; November 10 and May 10.

88. It appears taxes for 1987 and 1988 were paid appropriately but late. Interest is due from the date the taxes were originally due until the date they were actually paid.

[¶ 17] On October 5, 2001, BP filed a petition for review in the district court in accordance with W.R.A.P. 12. In the district court, BP raised these issues:

1. Does W.S. § 39–2–201(j) apply to the tax period and, if so, does it benefit taxpayers?

    a. Does W.S. § 8–1–107 apply to limit W.S. § 39–2–201(j) to prospective application when, at the time of the enactment of W.S. § 39–2–201(j) there was no pending action, prosecution or proceeding?

    b. Is the Department estopped from now claiming W.S. § 39–2–201(j) does not apply when the former Chairman of the Board previously told Amoco that it applied and the Director expressed a similar opinion?

2. Does W.S. § 39–3–102(b) restrict the County's right to collect the allegedly delinquent taxes at issue in this matter?

3. Does W.S. 39–14–208(b)(ii) preclude the Department from changing values prior to production year 1985?

4. Was the County's intervention proper and, if so, timely when it delayed filing a Motion for Intervention until six years after the commencement of the action and after the Supreme Court had remanded the case back to the Board?

    a. Was the County a "person" and "a real party in interest?"

5. Should Nancy Freudenthal and Davis & Cannon have been disqualified from representing Sweetwater County as a result of her prior involvement in the matter as Chairman of the Board?

    a. Do the Board's rules overrule the Rules of professional responsibility?

    b. Did Nancy Freudenthal and Davis & Cannon violate the Rules of Professional responsibility in her and their representation of Sweetwater County?

6. Is wellhead the only acceptable method for reporting down-hole commingled production in a unit when, during the tax period, the Department accepted any reasonable method for reporting down-hole commingled production?

7. Did the Department abuse its discretion by issuing the February 28, 1994 letter without conducting any review of the County's findings?

8. Can Amoco be required to pay an ad valorem tax without an assessment and for a partial mill levy?

9. Can Amoco be required to pay a tax when it never received a tax bill?

10. Was Amoco's method of reporting the production from the Wertz Dome Unit for the tax period reasonable?

11. Was Notice of Valuation Change 90–355 res judicata for a further proceeding on production years 1980 through 1986?

12. Should Amoco be required to pay interest on any underpayment based on the facts of this matter? [Vol. I, 2–3]

[¶ 18] After comprehensive briefing by the parties, the district court issued this decision letter on June 18, 2004:

This case comes before the Court on appeal from the State Board of Equalization (SBOE) administrative hearing. After reviewing the record and other pertinent documents, the Court finds that substantial evidence supports the SBOE's decision in favor of the Wyoming Department of Revenue (DOR), reallocating ad valorem taxes assessed from 1981–1987 by Amoco Production Company (Amoco), currently known as BP America Production Company, at the Wertz Dome field in southwest Wyoming and affirms it. The Court specifically finds:

1. The DOR did not approve Amoco's arbitrary method of allocation;

2. Wyoming statutes do not preclude the SBOE's findings of fact and conclusions of law;

3. Accrual of interest began with DOR's notification to Amoco; and

4. Sweetwater County's representation and involvement before the SBOE did not constitute harmful error.

*Background*

Amoco Production Company challenges the SBOE finding that Amoco owes additional ad valorem taxes on its Wertz Dome oil production. During production years 1980 to 1986 (tax years 1981–1987), Amoco fully reported ad valorem taxes. Because the field straddles Carbon and Sweetwater County lines, it was impossible to determine in which county the oil originated and difficult to calculate and divide the ad valorem taxes between the counties. (R. Vol. 9 at 158–59.) Amoco arbitrarily allocated 66% production to Carbon County and 34% to Sweetwater County. Sweetwater County had the higher mill levy. (SBOE Findings of Fact, Conclusion of Law and Decision and Order at 4.) Sweetwater County retained an independent auditor to review Amoco's allocation method, and that auditor discovered an imbalance in production reporting. The DOR requested that Amoco amend its forms or explain "the apparent discrepancies." (Letter from Peterson to Cartwright of 12/14/89.)

On May 2, 1990, Amoco filed amended returns for the production years 1987–1988 and relied upon W.S. § 39–2–201(j), which had been enacted on March 20, 1990. In 1994, the DOR again requested reallocation of ad valorem taxes for production years 1980 to 1986. (Findings of Fact, *supra*, at 9 ¶ 35; In re 1988 & 1989 Assessment of Amoco Prod. Co.'s 1987 & 1988 Oil Prod., SBOE Special Directive 90–355 (July 2, 1990).) Amoco challenged the DOR request for reassessment before the SBOE in February 2001. The DOR sought "additional ad valorem taxes on the amount attributable to the Sweetwater County's higher mill levy." (Findings of Fact, *supra*, at 3.) The SBOE found in favor of the DOR and this timely appeal followed.

*Standard of Review*

The Court must review the SBOE administrative decision according to the Wyoming Administrative Procedure Act (WAPA). The court will:

Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

. . . .

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

W.S. § 16–3–114(c)(ii)(A), (D), (E) (LexisNexis 2003). Substantial evidence is the appropriate test "when factual findings are involved and both parties submit evidence." *Newman v. State ex rel. Wyo. Workers' Safety and Compensation Div.*, 2001 [2002] WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002). Therefore, the SBOE's findings must be upheld as long as this court determines that the record contains "relevant evidence which a reasonable mind might accept in support of the conclusions of the agency." *State ex rel. Wyo. Dep't of Revenue v. Union Pacific R.R. Co.*, 2003

WY 54, ¶ 8, 67 P.3d 1176, ¶ 8 (Wyo.2003) (quotations omitted).

Unless there is credible evidence to the contrary, DOR tax assessments "are presumed valid, accurate and correct." *Airtouch Communications, Inc. v. Dep't of Revenue, State of Wyoming,* 2003 WY 114, ¶ 12, 76 P.3d 342, ¶ 12 (Wyo.2003) (citations omitted). Amoco must "prove by a preponderance of the evidence" that the ad valorem reassessment of Sweetwater County's Wertz Dome production during 1980–1986 was "not derived in accordance with the required constitutional and statutory requirements for valuing state-assessed property." *Airtouch,* ¶ 12 (citation omitted). The petitioner must present "credible evidence" to overcome the presumption that the tax assessments are accurate; "a mere difference of opinion as to the value is not sufficient." *Id.* If the presumption is successfully overcome, the burden "shifts to the DOR to defend its valuation." *Id.,* ¶ 12 (citation omitted).

*Discussion*

This appeal considers whether Amoco's ad valorem taxes were properly reported. Wyoming's ad valorem tax, a self-reporting tax system, is a tax "according to value," W.S. § 39–13–101(a)(i) (LexisNexis 2003), and is based upon the ownership or interest in "the gross production of minerals for the previous calendar year." Wyo. DOR Rules ch. 6 § 5(a)(i) (Oct. 12, 1995) (*http://soswy.state .wy.us* ). The ad valorem tax is calculated according to the appropriate county mill levy. *Union Pacific Res. Co. v. State,* 839 P.2d 356, 361 (Wyo. 1992). Once the taxpayer reports ad valorem taxes to the DOR, the DOR verifies the taxable value of the property. (R. Vol. 11 at 135.)

The DOR found that Amoco had not properly calculated the value of Sweetwater County's oil production from the Wertz Dome unit; consequently, the DOR demanded tax amendments. The SBOE findings in favor of the DOR were proper for four reasons. First, substantial evidence supports the SBOE's holding that the DOR did not approve Amoco's method of allocation. Second, no Wyoming statute precludes the SBOE's findings. Third, the accrual of interest against Amoco began with proper notification from the DOR. Fourth, Sweetwater County's participation and representation before the SBOE did not constitute harmful error.

1. *Substantial evidence supports the conclusion that the DOR did not approve Amoco's method of allocation.*

The DOR expected that Amoco would measure its production at the mouth of each well on the Wertz Field, rather than arbitrarily allocate its production. Upon its administrative review before the SBOE, Amoco bore the burden to prove "that the methodology used and valuations reached by DOR were not supported by substantial evidence available in the agency record." *Airtouch,* ¶ 13. By this standard, it is immaterial whether other methodologies exist, as long as the methodology used by the DOR was supported by substantial evidence. Amoco failed to meet its burden; the well-head methodology was supported by substantial evidence. Consequently, the SBOE properly upheld the DOR's disapproval of Amoco's production allocation for two reasons. First, the DOR had only approved an allocation based upon the location of the wells. Second, Amoco's allocation method was unreasonable.

a. SBOE properly held that DOR had only approved allocation based upon the location of the wells.

The SBOE ruled that the DOR had approved allocation based upon well location, but had not approved Amoco's arbitrary allocation method. The legislature has specified that oil production be reported in the county in which the well is located unless the taxpayer requests, in writing, to use another reasonable method.

> For mines and mining claims, the taxpayer shall report the location of the production to the county and tax district in which the well, mine or mining claim is located, based upon the actual taxable production produced by the well or mine in each county or tax district. Other reasonable methods of reporting the location of production may be approved by

the department upon a written request of the taxpayer or taxing jurisdiction. W.S. § 39–2–213 (Michie 1994) (repealed). According to the evidence, Amoco failed to produce any documentary proof demonstrating that the DOR approved of the 66/34 allocation. (R. Vol. 9 at 159.) One witness testified that he "believed" the DOR approved the allocation "whether through response or inaction." (R. Vol. 9 at 151.) This weak statement does not constitute sufficient evidence to overcome Amoco's burden proof in this case. Further, Amoco's allocation method was unreasonable because Amoco did not "provide a rational explanation for the 66/34 split." (Findings of Fact, *supra*, at 7, ¶ 21.) Amoco failed to demonstrate that the "methodology used and the valuations reached by DOR were not supported by substantial evidence." *Airtouch*, ¶ 13.

b. The evidence supports the SBOE's holding that Amoco's allocation method was unreasonable.

Amoco allocated Wertz Dome oil production by arbitrarily determining that 66% originated in Carbon County and 34% originated in Sweetwater County. The SBOE determined that substantial evidence demonstrated that the 66/34 allocation was unreasonable. The SBOE found that Amoco's reports to the DOR conflicted with Amoco's filings with the Wyoming Oil and Gas Conservation Commission; Amoco's reports and allocation method "were not based upon actual production;" and Amoco failed to "identify a rational and consistent basis for how it allocated production between Sweetwater and Carbon Counties." (Findings of Fact, supra, at 12 ¶ 63.) The evidence also indicates that Amoco failed to accurately report production to the appropriate county.

Upon review, the Court is not required "to determine which of the various appraisal methods is best or most accurately estimates fair market value; rather, it is to determine whether substantial evidence exists to support usage of the chosen method of appraisal." *Airtouch*, ¶ 12. Substantial evidence supports the DOR's rejection of Amoco's allocation, especially in light of Amoco's inability to justify the 66/34 split.

While numerous witnesses suggested diverse hypotheses of the reasoning behind the 66/34 allocation, this diversity only serves to prove the point. According to the witnesses, the 66/34 split was variously used for ease and convenience (R. Vol. 9 at 111), based upon the ratio of land leased in each county (R. Vol. 9 at 142–43), and based on a calculation of the 40–acre spacing between wells (R. Vol. 10 at 41–42). Even Amoco's taxation employees could not agree on a consistent basis for the allocation. (*Compare* testimony from Paul Syring, employed in Amoco's Property Tax Department, at R. Vol. 9 at 111, and testimony from Bruce Cartwright, Amoco's former taxation representative, at R. Vol. 10 at 41–42). Mr. Cartwight admitted that the 66/34 allocation did not reflect the actual volumes produced at each well. (R. Vol. 10 at 139–140.) Richard Ryan, independent auditor for Sweetwater County, testified that Amoco inconsistently allocated production. The evidence does not justify Amoco's allocation method.

2. *No Wyoming statute precludes the SBOE's Findings of Fact or Conclusions of Law.*

Amoco presents three arguments to support its position that Wyoming statutes prohibit the DOR's reassessment of ad valorem taxes. First, Amoco argues that W.S. § 39–2–201(j) applies retroactively to limit ad valorem reassessment to 1988–1989 only. Second, Amoco claims that W.S. § 39–3–102, providing cancellation of uncollected taxes ten years after levy, and § 39–2–403, allowing additions of omitted property to assessment rolls within five years, prevent the DOR's reassessment. Finally, Amoco contends that W.S. § 39–14–208(b)(ii) prevents tax amendments prior to 1985.

The Court will examine each statute, inquiring "into the ordinary and obvious meaning of the words employed by the legislature according to the manner in which those words are arranged." *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2002 WY 181, ¶ 18, 60 P.3d 129, ¶ 18

(Wyo.2002). Unambiguous terms bind the Court "to the results so expressed." *Id.* If there is more than one reasonable interpretation, the statute is ambiguous, and the court will engage the "general principles of statutory construction." *Id.* The court will "affirm an agency's conclusions of law when they are in accordance with the law" and will correct an erroneous application of the law. *Union Pacific R.R. Co.,* ¶ 8 (citations omitted).

a. W.S. § 39–2–201(j) does not apply retroactively to limit reassessment to 1988–1989.

. . . .

... On December 14, 1989, the DOR required Amoco to amend its ad valorem tax assessment for erroneously allocating production from the Wertz Dome Unit. The DOR's requirement initiated the proceedings in this case. Applying § 39–2–201(j) would require explicit, statutory language of retroactivity, as this case had already commenced.

Section 39–2–201(j) will therefore not be applied retroactively to the events that gave rise to this lawsuit. Tax measures "will be construed prospectively only if there is a doubt whether the statute was intended to be retroactive." *Belco Petroleum Corp. v. State Bd. Of Equalization,* 587 P.2d 204, 210 (Wyo.1978) (citations omitted). "A statute is not necessarily retroactive because it draws on antecedent facts for its operation." *Wyo. Refining Co. v. Bottjam [Bottjen],* 695 P.2d 647, 650 (Wyo.1985).

Amoco asserts that § 39–2–201(j)·should be applied retroactively in this case because an SBOE opinion indicated that W.S. § 39–2–201(j) would operate retroactively. After receiving the DOR notification to amend its ad valorem tax reports, Amoco met with the former SBOE chairman and discussed "tax policy" behind the then-pending W.S. § 39–2–201(j). (R. Vol. 10 at 57.) The evidence indicates, however, that Amoco continued its independent review, and relied upon its discussion with the chairman only to "forestall any need to file amended returns," (R. Vol. 10 at 59.) A taxpayer may "act in reliance upon a written interpretation" of a statute by the SBOE. W.S. § 39–6–304(j) (Michie 1994). Basic rules of statutory construction require that effect be given to every word of a statute, because it is presumed that the legislature has not included useless words. *State Board of Equalization v. Tenneco Oil Co.,* 694 P.2d 97, 99 (Wyo.1985). The legislature specifically used the term "written" in this statute; taxpayers thus may only rely upon a written interpretation. Amoco did not acquire the necessary written interpretation of retroactivity of § 39–2–201(j).

Amoco has argued that W.S. § 39–2–201(j) is a statute of limitations, is remedial, and should be applied retroactively. (Br. Of Appellant at 41.) There is a presumption against the retroactivity of statutes of limitation, *Wyo. Refining,* 695 P.2d at 650; likewise no statute of limitations restricts the "collection of unpaid severance and ad valorem taxes due upon mineral production." *Union Pacific Res.,* 839 P.2d at 380. Amoco attempts to distinguish its case from *Union Pacific Resources* by asserting that, unlike *Union Pacific Resources,* Amoco did not fail to report the entirety of its productivity, but only failed to properly allocate taxes. (Br. Of Appellant at 44.)

Amoco's argument is flawed for two reasons. First, the language in *Union Pacific Resources* does not limit itself to unreported taxes, but instead refers to "unpaid severance and ad valorem taxes." *Id.* This language includes not only unreported taxes, but also improperly allocated (and thus unpaid) taxes. Second, there is a difference between failing to properly allocate value and failing to properly include property in a tax assessment. Amoco, in failing to properly report its ad valorem taxes, has failed to properly include property in a tax assessment, because an ad valorem tax relates to the ownership interest in the mineral produced. The Wyoming legislature "has given express authority for the Department of Revenue to reassess undervalued property under W.S. § 39–1–304(a)(xiv)." *Wyo. State Tax Comm'n v. BHP Petroleum Co. Inc.,* 856 P.2d 428, 436–437 (Wyo.1993). The court has held

"that the omitted property statute does not limit the State's power under W.S. 39–1–304(a)(xiv) to reassess property that was undervalued." *Id.* Thus, *Union Pacific Resources* is applicable, and Amoco's failure to reassess the taxable value of Sweetwater County wells must be remedied. [Footnote omitted.]

The SBOE found no other Wyoming statute capable of making W.S. § 39–2–201(j) applicable. Of particular concern was W.S. § 8–1–107 (LexisNexis 2003) which states, "If a statute is repealed or amended, the repeal or amendment does not affect pending actions...." The application of § 8–1–107 is moot. The SBOE correctly found that the events triggering the reallocation of taxes occurred before March 20, 1990, the effective date of W.S. § 39–2–201(j). (Findings, supra, at 11 ¶ 50.) As W.S. § 39–2–201(j) never applied in the first place, W.S. § 8–1–107 cannot make it apply now.

b. W.S. § 39–3–102, providing for cancellation of uncollected taxes ten years after levy, and W.S. § 39–2–403, allowing additions of omitted property to assessment rolls within five years, do not prevent the DOR's reassessment.

Amoco argues that W.S. § 39–3–102 (Michie 1994) (repealed), which limits the collection of ad valorem taxes to ten years, and W.S. § 39–2–403, which limits reassessments of omitted property to five years, restrict the DOR reassessment of ad valorem taxes. Amoco further argues that it was arbitrary and capricious for the SBOE to find that neither statute affected the inapplicability of W.S. § 39–2–201(j).

Amoco's reliance upon § 39–3–102 to restrict the collection of delinquent taxes in Sweetwater County is misplaced. The statute indicates, "All personal property taxes not collected within ten (10) years from the time the taxes were levied shall be cancelled and are thereafter uncollectible. W.S. § 39–3–102(b) (repealed). The court has determined that Tile 39, Article 3, applies exclusively to reassessments by the county rather than by the state.

Article 2 of [Title 39 of the Wyoming Statutes] covers state assessments, and Article 3 covers county assessments. *Id.* With mineral assessments, the SBOE is required to calculate and set the assessment. W.S. 39–2–201(e) (Cum.Supp.1992). With other types of property, the task of calculating and setting the assessment belongs to the county assessor. Under the mineral assessment procedure, although the County does enter the assessment on the tax rolls, the certification of the assessment is done by the State.

*BHP Petroleum Co. Inc.*, 856 P.2d at 436–437. As an Article 3 provision, the ten-year limitation found in § 39–3–102 applies to the collection by the county rather than the state. Section 39–3–102 is inapplicable to the current case.

Wyoming Statute § 39–2–403 limits to five years the addition of omitted property in assessment rolls. "Property omitted from prior year tax lists discovered by the county assessor shall be added to the assessment roll and taxes computed and collected for the period the property was omitted not exceeding five (5) years...." W.S. § 39–2–403(c) (repealed). Like its analysis of § 39–3–102, the court limited the applicability of § 39–2–403(c) to county assessments. *BHP Petroleum Co. Inc.*, 856 P.2d at 437. Therefore, the SBOE is not precluded from reassessing and levying ad valorem taxes on omitted property values, such as the Wertz Dome production values in Sweetwater County.

c. W.S. § 39–14–208(b)(ii) does not prevent tax reassessment for the years prior to 1985.

Amoco contends that the law prevents the DOR from changing mineral values for production years before 1985. Amoco did not raise the issue of the applicability of § 39–14–208 during the SBOE hearing. The SBOE did not consider the issue during its February 12–14, 2001 hearing. In fact, the record indicates that Amoco first raised the issue in its proposed Findings of Fact and Conclusions of Law filed with the SBOE April 5, 2001. Opposing parties were not given an opportunity to address this issue before the SBOE.

The court disfavors hearing issues raised for the first time on appeal. "As we have consistently stated over many years, Wyoming appellate courts do not review issues raised for the first time on appeal. This rule is equally applicable to appeals from administrative decisions as to those from district courts." *Shaffer v. Wyo. Workers' Compensation Div.*, 960 P.2d 504, 507–508 (Wyo.1998) (citations omitted). The only exceptions to this rule are "jurisdictional issues and issues of such a fundamental nature that they must be considered." *In re Pohl v. Bailey Co.*, 980 P.2d 816, 819 (Wyo.1999) (quotations omitted). As this case falls into neither category, the applicability of W.S. § 39–14–208 will not be considered by this Court.

3. *The accrual of interest began with proper notification by the DOR to Amoco.*

Amoco challenges the SBOE determination of interest and the adequacy of the reassessment notification. First, Amoco asserts that the SBOE's decision to charge interest was arbitrary and capricious. Second, Amoco challenges the adequacy of the DOR notice of additional tax liability.

The law assesses interest according to the delinquency of the tax. The tax is delinquent when the taxpayer "knew or reasonably should have known" that the tax was not paid when due. *Kunard v. Enron Oil & Gas Co.*, 869 P.2d 132, 134 (Wyo.1994) (quotation omitted). The taxpayer "knows or should reasonable know" its tax liability "when the tax is due." *Id.* at 134. "[U]nderpaid ad valorem tax is delinquent on the date it should have been paid, not only the later date of notification and demand." *Kunard*, 869 P.2d at 135 (quotations omitted). If the taxpayer disagrees with a tax bill, the taxpayer may pay principle amount of taxes due "in protest." Payment in protest stays the accrual of interest and, upon a favorable disposition by the SBOE, allows a refund of the controverted taxes. (R. Vol. 11 at 22.) Amoco did not pay its taxes in protest, and thus interest accrued.

First, Amoco argues that the SBOE arbitrarily assessed interest. The SBOE examined each production year in question and allocated interest based upon when Amoco knew or should have known of its tax liability. For example, the SBOE found that during 1980–1983, Amoco "did not take reasonable steps to address its tax problem after notification," and interest accrued beginning with notice to Amoco on January 9, 1990. (Findings of Fact, *supra*, at 16–17.) From 1984 to 1986 Amoco owed interest for the portion of the time when "taxes were not paid based on location." (*Supra.*) For the years 1987 to 1988, Amoco paid the reassessed taxes late, and the SBOE found interest was due "from the date the taxes were originally due until the date they were actually paid." (*Supra.*) Substantial evidence demonstrates that the SBOE appropriately assessed an accrual of interest.

Second, Amoco argues that the SBOE arbitrarily required Amoco to pay additional tax without a bill or a Notice of Valuation Change (NOVC), the customary form sent to taxpayers for value amendments. "Failure to send notice, or to demand payment of taxes, does not invalidate any taxes due." W.S. § 39–3–101(e) (Michie 1994) (repealed). The SBOE agreed that a tax notice was "not necessarily to create a tax liability." (Findings of Fact, *supra*, at 16 ¶ 82.)

In February 1994, the DOR informed the Sweetwater County Assessor by letter, with a copy sent to Amoco, that ad valorem reallocation would be necessary for the tax years 1981–1987 on the Wertz Dome Field. (R. Vol.12, Ex. 115.) The text of the letter identified itself as a "notice of valuation change." Although the letter was not the customary format for a NOVC (R. Vol. 10 at 54), the letter plainly informed Amoco to amend its ad valorem tax reports. Because Amoco partially complied with the DOR notice in 1990, it cannot logically claim that the failure to fully amend the ad valorem reports was attributable to the failure to send an NOVC. Amoco was properly notified.

4. *Sweetwater County's representation and involvement before the SBOE did not constitute reversible error.*

Two procedural errors are alleged. First, Amoco argues that Sweetwater County should not have been permitted to intervene in the SBOE hearing. Second, Amoco argues that the former SBOE chairman should not have been permitted to represent Sweetwater County in the hearing before the SBOE.

a. Sweetwater County's intervention before the SBOE was justifiable and does not constitute reversible error.

Amoco argues that Sweetwater County's intervention into the SBOE hearing was procedurally erroneous. Appellant quotes SBOE Rules ch. 2 § 13(a), which addresses the joinder of persons before the SBOE. More appropriately, Rules ch. 2 § 14(a) permits intervention by a county into an SBOE hearing.

> Upon timely motion, any person, including a board of county commissioners, may be permitted to intervene in a case ... when the movant claims an interest relating to the matter or transaction which is the subject of the case and is so situated that the disposition of the case may as a practical matter impair or impede his ability to protect that interest.

SBOE Rules ch. 2 § 14(a) (Oct. 22, 2001) (*http://soswy. state.wy.us*). Sweetwater County asserted an interest that may have been impeded without intervention. Amoco does not deny this, but claims that Sweetwater County's intervention was not timely. Even if Amoco is correct, the SBOE did not commit harmful error. Amoco has not shown, nor does the evidence suggest, that Sweetwater County's intervention influenced the SBOE's decision or harmed Amoco's rights. Because Amoco cannot show it was harmed, and because Sweetwater County's interest in intervening was justifiable and intervention is discretionary within the SBOE rules, this Court cannot say that the intervention was unreasonable.

. . . .

*Decision*

The Court affirms the SBOE decision to permit reassessment of ad valorem taxes from production years 1980–87. Allocation based upon well location is the appropriate method of assessment in this case. Wyoming statutes do not preclude the SBOE's findings or conclusions. The accrual of interest and Sweetwater County's involvement before the SBOE were appropriate. The Court's Mandate of Affirmance follows.

[¶ 19]   On July 16, 2004, BP filed a notice of appeal seeking review in this Court. The final brief for this case was filed on May 16, 2005, and the Court took the case under advisement after hearing oral argument on June 23, 2005.

## STANDARD OF REVIEW

[¶ 20]   The applicable standard of review has been well summarized in our prior decisions:

> Wyo. Stat. Ann. § 16–3–114 provides for judicial review of administrative agency action. In particular, Wyo. Stat. Ann. § 16–3–114(c)(ii) requires the reviewing court to "[h]old unlawful and set aside agency action, findings and conclusions found to be:"
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> (B) Contrary to constitutional right, power, privilege or immunity;
>
> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>
> (D) Without observance of procedure required by law; or
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
>
> We have held that "the substantial evidence test is the appropriate standard of review in appeals from [Wyoming Administrative Procedure Act] contested case proceedings when factual findings are involved and both parties submit evidence." *Newman v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo.2002). In addition,

[w]hen we are reviewing cases [that] have been certified to us pursuant to W.R.A.P. 12.09(b), we apply the appellate standards [that] are applicable to a reviewing court of the first instance. *Hepp v. State ex rel. Wyoming Workers' Compensation Division*, 881 P.2d 1076, 1077 (Wyo.1994). When we are conducting our review,

"[o]ur task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. Substantial evidence is relevant evidence [that] a reasonable mind might accept in support of the agency's conclusions."

*Latimer v. Rissler & McMurry Co.*, 902 P.2d 706, 708–09 (Wyo.1995) (citations omitted).

"We do not, however, defer to an agency's conclusions of law. 'Instead, if the "correct rule of law has not been invoked and correctly applied, ... the agency's errors are to be corrected.' " *Thunder Basin Coal Company v. Study*, 866 P.2d 1288, 1291 (Wyo.1994) (quoting *Devous v. Wyoming State Board of Medical Examiners*, 845 P.2d 408, 414 (Wyo.1993))."

*Celotex Corporation v. Andren*, 917 P.2d 178, 180 (Wyo.1996).

*JM v. Department of Family Services*, 922 P.2d 219, 221 (Wyo.1996). The burden of proving a lack of substantial evidence is upon the party appealing an agency's determination. *Mountain Fuel Supply Co. v. Public Service Com'n of Wyoming*, 662 P.2d 878, 883 (Wyo.1983). And specifically, the burden of proof with respect to tax valuation is on the party asserting an improper valuation. *Amoco Production Co. v. Wyoming State Bd. of Equalization*, 899 P.2d 855, 858 (Wyo.1995) (*quoting Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107, 113 (Wyo.1987)).

"Statutory interpretation is a question of law and is reviewed de novo." *State ex rel. Wyo. Dept. of Revenue v. Powder River Coal Co.*, 2004 WY 54, ¶ 5, 90 P.3d 1158, 1159 (Wyo.2004).

When interpreting statutes, we follow an established set of guidelines. First, we determine if the statute is ambiguous or unambiguous. A statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. Unless another meaning is clearly intended, words and phrases shall be taken in their ordinary and usual sense. Conversely, a statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations. *Parker Land & Cattle Co. v. Wyoming Game & Fish Comm'n*, 845 P.2d 1040, 1042–43 (Wyo.1993).

*Powder River Coal Co.*, 2004 WY 54, ¶ 5, 90 P.3d at 1160.

*Williams Production RMT Company v. State Department of Revenue*, 2005 WY 28, ¶¶ 6–8, 107 P.3d 179, 182–83 (Wyo.2005); also see *BP America Production Company v. Department of Revenue*, 2005 WY 60, ¶¶ 10–13, 112 P.3d 596, 601–03 (Wyo.2005); and *Amoco Production Company v. Board of Equalization*, 2001 WY 1, ¶ 5, 15 P.3d 728, 730–32 (Wyo.2001).

## DISCUSSION

[¶ 21] BP posits this as the central issue in this case: "[W]hether any statute or rule existed during the production years at issue [1980 through 1986] that specifically required the taxpayer to report volumes and values for the gross products tax in the county where the well was physically located when the leases and underlying reservoir crossed county lines and no metering or sales occurred at the wellhead?" However, as noted above, BP raises at least fifteen other issues, as well as a number of sub-issues. As has been its strategy from the outset of this case, BP attempts to distract this Court from the essential issue, which is that it improperly allocated production from oil wells in Sweetwater County (which had a higher mill levy) to Carbon County (which had a lower mill levy). BP insists quite rightly that it reported all of its production, but really never accepts that the problem is that it did not accurately report that production for ad valo-

rem tax purposes, and that is what we are concerned about in this case.

**Does the SBOE's Decision to Allow Sweetwater County to Intervene Constitute Reversible Error**

[¶ 22] This contention looks to our decision in the case *Amoco Production Company v. Department of Revenue*, 2004 WY 89, ¶¶ 9–27, 94 P.3d 430, 436–442 (Wyo.2004), for its vitality. BP asserts that this Court must reverse the district court's decision and remand this matter back to the SBOE with instructions that Sweetwater County be dismissed from the proceedings "along with the testimony and evidence made before the [SBOE]." The instant case differs from the case cited immediately above in that here Sweetwater County did not take a position adverse to that of the DOR, indeed Sweetwater County's position mirrored that of the DOR. *Id.*, at ¶ 24, 94 P.3d at 440–41. It also differs in that Sweetwater County, at least arguably, had a legally protected interest in "a quantities validation program for collection."

> Remembering our rule of strict construction, and given that the legislature has made no further amendments to the relevant tax statutes, we find that the legislature did not intend to expand the role of the counties in the valuation process. We have previously summarized the roles of the parties in the property valuation process:
>
> > There exists then, under current state taxation methodology, three state play-

ers and the counties: the state Department of Revenue with the collection and taxation supervision responsibilities; the State Board of Equalization with a semi-judicial appeal and supervisory responsibility; and the Mineral Audit Division of the Department of Audit with a delinquency audit responsibility; and finally, county governments which have a direct pecuniary interest in the collection of the ad valorem tax. Value is established by the Department of Revenue subject to appeal to the State Board of Equalization with the function of the counties regarding ad valorem tax only limited to a quantities validation program for collection.

> *Union Pacific Resources Co. v. State*, 839 P.2d 356, 377 (Wyo.1992). We believe the role of the counties remains the same. The only difference is that now a county can bring a contested case before the Board to challenge Department findings as to quantity or any similar alleged error. A county cannot challenge a decision by the Department regarding valuation methodology or any substantive decision regarding the application of a chosen valuation methodology, including the definition of inputs into valuation equations.

*Id.*, at ¶ 20, 94 P.3d. at 439.

[¶ 23] Although we also held that the SBOE's rule on intervention [16] was null and void, here Sweetwater County's intervention was arguably proper under W.R.C.P. 24(a). *Id.*, at ¶¶ 14–16, 94 P.3d at 437–38. A continuation of our holding in the *Amoco Production* case was this:

> (b) Any applicant, desiring to intervene shall file an application to intervene with the Board and serve a copy on all parties in the case. The application shall state the grounds therefore, set forth the position for which intervention is sought, and advise the parties that should they wish to contest the application they must file with the Board and serve on all parties and the applicant a written response within fifteen (15) days of service of the application. No application to intervene shall be filed within twenty (20) days of a hearing.
> 5 *Weil's Code of Wyoming Rules*, Board of Equalization, Rules of Practice and Procedure for Cases Before the Wyoming State Board of Equalization, Chapter 2, Section 14, 211000 002–3 through 002–4 (2005).

16. The SBOE's rule on intervention subsequently has been modified:
    Section 14. *Intervention.*
    (a) As authorized by the Wyoming Administrative Procedure Act, any person or agency may be admitted as a party to a proceeding before the Board if entitled as of right to do so. Upon timely application, any applicant, may be permitted to intervene in a case: (1) when a statute confers an unconditional right to intervene: or (2) when the applicant claims an interest relating to the matter or transaction which is the subject of the case and is so situated that the disposition of the case may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The Department, in its brief, presents no argument as to the propriety of the intervention by Uinta County into the administrative case. Instead, the Department argues that this Court should review the merits of the issue presented by Uinta County in the name of judicial economy. The Department informs this Court that it has accepted the ruling of the Board on this issue and has informed all affected taxpayers to include production taxes and royalties as direct production costs. The taxpayers, predictably, have appealed the Department's decision. The Department argues that, since this Court will have to decide the issue at some point, it might as well do so now. This argument, however, ignores the procedural posture of this case. We have already held that Uinta County had no authority to intervene. We have also held that Uinta County cannot legally challenge the initial decision by the Department on this issue. Thus, this issue has no place in this particular proceeding at this stage. Judicial economy cannot be invoked as a pretext for this Court to issue an advisory opinion. We decline to review the issue on the merits. The contested case should have proceeded without the intervention of Uinta County or a review of the issue brought by Uinta County. Uinta County is dismissed from this appeal. Upon remand, Uinta County, as well as the issue it presented, must be dismissed from the action.

*Id.,* at ¶ 26, 94 P.3d at 441.

[¶ 24] Amoco simply does not present cogent argument nor does it cite pertinent authority that allowing intervention as a matter of right was reversible error under the circumstances of this case, especially in consideration of the circumstance that the evidence presented at hearing would likely have been identical whether Sweetwater County was a party or not. We hold that the SBOE's decision to allow Sweetwater County to intervene does not require reversal.

**Propriety of Partial Mill Levies**

■ [¶ 25] BP contends that the SBOE, the DOR, and Sweetwater County all lack statutory authority to make "use of partial mill levies in the collection of ad valorem taxes on increased mineral values for production years 1980–1986."

[¶ 26] We embark on this discussion by making reference to our own description of the DOR's and the SBOE's role in the taxation process:

A comparison of the roles of the Department and the Commission as established by the legislature demonstrates that the Department, acting through the Board, is vested with pervasive and sole authority over all aspects of the taxation of Wyoming citizens and business entities, including the construction of any statute affecting the assessment, levying, and collection of taxes. The Commission is empowered to adopt rules and regulations and act administratively to prevent waste and encourage the conservation of Wyoming's oil and gas resources. The Commission must make its decisions and promulgate its orders by its discerning conclusions as to what will either prevent or remediate waste.

*Kerr–McGee v. Wyoming Oil and Gas Conservation Commission,* 903 P.2d 537, 544 (Wyo.1995).

[¶ 27] Our response to this argument need only be brief. Partial mill levies were not used. BP had paid only a part of the mill levy on production in Sweetwater County. BP was required to make up the difference. The "mineral values" were not "increased," they simply were allocated to the proper production location (i.e., county). BP is not aggrieved in any way by the accommodations that needed to be made in order to work out the knotty problem created by its improper acts, and we are not persuaded that those accommodations were in any way in violation of the standards set out in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005).

■ [¶ 28] Moreover, we have long held that administrative agencies have certain implied powers necessary to fulfillment of their statutory purposes. Of course, those implied powers are only those derived by necessary implication from express statutory authority granted to the agency. *See Billings v. Wyoming Board of Outfitters and Guides,* 2001 WY 81, ¶ 24, 30 P.3d 557, 569 (Wyo.2001);

and *Cody Gas Company v. Public Service Commission*, 748 P.2d 1144, 1147–48 (Wyo. 1988). A more comprehensive statement of the concept of implied powers in this setting is this:

> Generally, administrative agencies have the implied or incidental powers that are reasonably necessary in order to carry out the powers expressly granted. The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency. However, the inherent or implied power of an administrative agency is not boundless.

> Courts disagree as to how much latitude administrative agencies have with respect to implied powers. Some courts say wide latitude must be given to administrative agencies in fulfilling their duties. Some of these courts even say that the authority does not have to be "necessary" to effectuate the expressly delegated authority, but only "appropriate." Other courts say that powers should not be extended by implication beyond what may be necessary for their just and reasonable execution. Still other courts state that implied powers are "necessarily implied," and that necessary implication is an implication which yields so strong a probability of intent to allow these powers that any intention to the contrary cannot be supposed.

2 Am.Jur.2d *Administrative Law* § 57 at 80–81 (2004).

[¶ 29] We conclude that the DOR, the county assessor, and the county treasurer possessed the authority to effectuate the remedy that the DOR structured for this matter.

**Is Use of Wellhead Reporting Supported by Substantial Evidence/Lawful/Arbitrary /Capricious**

■ [¶ 30] The supporting structure for this argument is BP's contention that it was not possible to ascertain with certainty exactly from where the oil production at issue here was originating, even though it did have the capacity to accurately measure production from each well at issue in this case. Therefore, it was necessary for BP to use some measurement method other than wellhead production. The supporting structure for this argument quickly collapses, however, because BP was unable to offer a measurement method that was more sound than that of measuring the production at the wellhead. Even though wellhead production was not completely accurate, it was considerably more accurate than any alternative method and the record supports a conclusion that BP knew that was the case, or at least it should have known that was the case. BP further contends that when all of the statutes and constitutional provisions that it deems pertinent to this discussion are read together, it "clearly shows a lack of legislative intent to focus on the physical location of the wellhead." Rather, BP continued, the focus should be "on the value of the gross product which is valued after the production process is completed." [Underscoring in the original.] We conclude that Wyo. Stat. Ann. § 39–2–201(e) (Michie 1977 and 1985) always contemplated that reporting of oil production should be done at the wellhead, and any other construction of those statutes is speculation. The enactment of Wyo. Stat. Ann § 39–2–213 (Michie 1990) did not constitute a "change," but only a restatement of what general practice had always been contemplated, the practice that was generally in place, and the practice that should generally continue. Any other construction of that statute would be purely speculative. We deem those statutes to be unambiguous but if we were to engage in speculation, we would conclude that the legislature intended to "clarify" what it had always intended so as to eliminate problems such as those with which we deal here today.

[¶ 31] Moreover, BP's argument in this regard is weakened by the fact that some of its reports to the WOGCC were based on wellhead production, not on its 66/34 split theory. It appears to be correct that methods other than wellhead production may be approved by the DOR, but we agree with DOR that substantial evidence supports the SBOE's determination that no such "other method" was approved by DOR, and no other method was generally recognized in the industry during this time frame. We also

agree with DOR's contention, which both the district court and the SBOE adopted, that the only correct method for reporting production, **under the circumstances of this case,** was by well location. That conclusion is supported by substantial evidence as set out above and is consonant with the governing statutes. Furthermore, we agree with the district court that the SBOE's decision in this regard was not arbitrary or capricious.

## Application of Wyo. Stat. Ann. § 39–2–214(a)

[¶ 32] BP also relies to a great extent on the application of Wyo. Stat. Ann. § 39–2–214(a) (Michie 1997) (enacted in 1991), contending that it precludes the SBOE from making the decision that it made. That statute provides:

> (a) Effective until March 1, 1994, the department is authorized to rely on final audit findings under W.S. 9–2–2003, taxpayer amended returns or department review, and to certify mine product valuation amendments for production in calendar year 1985 and thereafter, to the county assessor of the county in which the property is located, to be entered upon the assessment rolls of the county and taxes computed and collected thereon subject to appeal under subsection (g) of this section.

[¶ 33] In particular, BP contends that the district court erred in concluding that BP did not raise this issue below. It is evident from the SBOE's order that this statute did not enter into its reasoning process. The district court declined to address it because it was not raised below. We agree with the district court and the DOR that BP failed to clearly join this matter as an issue below, or to ask the SBOE to reconsider its order in light of its failure to address the statute BP now places as central to the resolution of this dispute Therefore, we will not further consider it here.[17]

---

17. However, we note in passing that it appears to be clear that the statute would not, in any event, have the effect that BP claims it should have. 1991 Wyo. Sess. Laws, ch. 257, sec. 2, at 806:

> **Section 2.** W.S. 39–2–214(a) through (d) as created by this act does not limit or affect

## Application of Wyo. Stat. Ann. § 39–2–201(j)

[¶ 34] We agree with the SBOE, the district court, and DOR that § 39–2–201(j) should not be given a retroactive application. *See Pohl v. Wyoming Workers' Safety and Compensation Division,* 980 P.2d 816, 820 (Wyo.1999) (and cases cited therein). We also conclude that the SBOE's findings that the events triggering the dispute in this case occurred prior to the enactment of § 39–2–201(j) are supported by substantial evidence. This holds true as well for the conclusion that it was BP's failure to timely remedy the problems identified in the DOR's 1990 directive that delayed the final resolution of this matter. What BP characterized as "waiver" based on "delay" simply is not supported by the record below. Moreover, by its very terms § 39–2–201(j) applies only to production "reported pursuant to W.S. 39–2–208." Wyo. Stat. Ann. § 39–2–208 (Michie 1997) was also enacted in 1990, so the 1980–86 production at issue here could not have been reported under § 39–2–201(j). Thus, this issue (or as presented by BP, combination of issues) does not mandate reversal of either the district court or the SBOE.

## Application of Wyo. Stat. Ann. 39–3–102(b) and Application of the *BHP* Case

[¶ 35] BP contends that the "district court committed reversible error when it confused the statutory provisions in Title 39, Chapter 2 (Assessment), Articles 2 and 3 with Title 39, Chapter 3 (Collection) and thereafter held W.S. § 39–3–102(b) applies exclusively to assessments by the county (Ch.2, Art. 3) rather than revaluations (Ch.2, Art. 2) initiated by the state." BP also contends that the district court erred in relying on *Wyoming State Tax Commission v. BHP Petroleum, Inc.,* 856 P.2d 428 (Wyo.1993).

[¶ 36] While the district court's decision letter may not be a model of clarity in this

audits that have been commenced, audit findings that have been issued, or mine product valuation amendments which have been filed with or approved by the state board of equalization or the department prior to the effective date of this act. . . .

regard, it is readily evident that if there was any error at all, it was a matter of the district court misspeaking and not the source of an error which requires reversal of either the district court's order or the order of the SBOE. The district court's application of the subject statute and the *BHP Petroleum* case did not create an error that requires reversal of this case. *See* SBOE's findings 79–81.

**Existence of Statute of Limitations on Collection of Ad Valorem Taxes**

[¶ 37] BP contends that the district court and the SBOE erred in adopting the position that there was no statute of limitations which prohibited the collection of ad valorem personal property taxes. This proposition is premised upon Wyo. Const., art. 3, § 40[18] and *Union Pacific Resources Company v. State*, 839 P.2d 356 (Wyo.1992), wherein we addressed statute of limitations concerns at some length. We conclude that BP misconstrues the position of the DOR, the conclusions of the district court, and misrepresents the applicability of various statutes cited in detail above.

[¶ 38] As the SBOE found in its order, Wyoming's ad valorem tax system is a self-reporting system, something of a magnanimous social contract designed to make the tax collector as unobtrusive as possible. By its very nature, it requires mineral producers to fully and accurately report mineral production in order that the system can function. If reporting is not accurate, and especially where reporting of production is not fully accurate by design, then that contract is broken. Without accurate reports, an accurate assessment cannot be ascertained and without an accurate assessment, an accurate tax cannot be imposed and collected. The various statutes of limitations are designed to further flesh out the self-reporting system, and they bring the tax assessment and tax collection process to a state of repose when the conditions for their application are met.

18. § 40. **Debts to state or municipal corporation cannot be released unless otherwise prescribed by legislature.**
No obligation or liability of any person, association or corporation held or owned by the state or any municipal corporation therein shall ever be exchanged, transferred, remitted, released,

However, where the self-reporting system has broken down and the process is tainted from its point of origin, statutes of limitations simply cannot, as a general rule, be called into play.

[¶ 39] In short, we cannot find in BP's arguments the thread of a rationale that requires reversal of the district court or the SBOE.

**Application of Wyo. Const. art. 15, §§ 3 and 11; Wyo. Const. art. 1, § 34**

[¶ 40] Laws are presumed to be constitutional and all doubts are resolved in favor of constitutionality. The statute's challenger bears the burden of showing unconstitutionality beyond any reasonable doubt. *Hede v. Gilstrap*, 2005 WY 24, ¶ 6, 107 P.3d 158, 163 (Wyo.2005). Article 15, § 3 provides:

All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof.

[¶ 41] Article 15, § 11 provides:

(a) All property, except as in this constitution otherwise provided, shall be uniformly valued at its full value as defined by the legislature, in three (3) classes as follows:

(i) Gross production of minerals and mine products in lieu of taxes on the land where produced;

(ii) Property used for industrial purposes as defined by the legislature; and

(iii) All other property, real and personal.

postponed or in any way diminished except as may be prescribed by the legislature. The liability or obligation shall not be extinguished except by payment into the proper treasury or as may otherwise be prescribed by the legislature in cases where the obligation or liability is not collectible.

(b) The legislature shall prescribe the percentage of value which shall be assessed within each designated class. All taxable property shall be valued at its full value as defined by the legislature except agricultural and grazing lands which shall be valued according to the capability of the land to produce agricultural products under normal conditions. The percentage of value prescribed for industrial property shall not be more than forty percent (40%) higher nor more than four (4) percentage points more than the percentage prescribed for property other than minerals.

(c) The legislature shall not create new classes or subclasses or authorize any property to be assessed at a rate other than the rates set for authorized classes.

(d) All taxation shall be equal and uniform within each class of property. The legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal.

[¶ 42] Article 1, § 34 provides: "All laws of a general nature shall have a uniform operation."

[¶ 43] BP has failed to meet the burden imposed on it in this regard. Moreover, these arguments are not supported by reference to pertinent authority or by cogent argument and we need not address them further.

**Should the Imposition of Interest be Modified; Error in Imposing Interest on Amended Returns for 1987 and 1988**

[¶ 44] After careful examination of the record, we conclude that the DOR's directives with respect to the imposition of interest on taxes not timely paid were correct under the applicable laws. We conclude that the SBOE's findings and conclusions in this regard are supported by substantial evidence and are consistent with applicable law. *See* findings 86 and 87. The district court did not err in affirming this portion of the SBOE's decision.

## CONCLUSION

[¶ 45] The order of the district court affirming the actions taken by the SBOE is affirmed. This matter is remanded to the district court with directions that it further be remanded to the SBOE for effectuation of its September 5, 2001 order.